**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOUKE HALE, | ) | |
| on behalf of plaintiff and a class, | ) | |
| | ) | |
| Plaintiff, | ) | 08 CV 3918 |
| | ) | |
| vs. | ) | Judge Coar |
| | ) | Magistrate Judge Schenkier |
| AFNI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S PRELIMINARY MOTION FOR CLASS CERTIFICATION

Plaintiff respectfully requests that this Court enter an order determining that Counts I and II of this action may proceed as a class action against defendant AFNI, Inc. ("AFNI"). Count I is a class claim under the Fair Debt Collection Practices Act ("FDCPA"); Count II is a class claim under the Illinois Collection Agency Act ("ICAA"), and Count III is an individual claim under the Fair Credit Reporting Act ("FCRA").

Plaintiff seeks certification of two classes which are defined as follows:

Count I: (a) all individuals (b) with addresses in Illinois, Indiana, or Wisconsin, (c) who were sent a letter in the form represented by Appendix A, (d) on or after July 10, 2007 (a date one year prior to the filing of this action), and on or before July 30, 2008 (20 days after the filing of this action;

Count II: (a) all individuals (b) with addresses in Illinois, (c) who were sent a letter in the form represented by Appendix A, (d) on or after January 1, 2008.

Plaintiff further requests that Edelman, Combs, Latturner & Goodwin, LLC be appointed counsel for the class.

In support of this motion, plaintiff states as follows:

### NATURE OF THE CASE

1.      In this action, plaintiff alleges that AFNI violated the FDCPA and the ICAA by sending letters in the form represented by Appendix A.  Specifically, Plaintiff complains that

1

Appendix A falsely states that AFNI is "unable to investigate" the dispute and that the consumer has provided "insufficient information to substantiate your claim." In fact, AFNI is readily capable of verifying the debt and the consumer is not obligated to substantiate anything.

The letter is therefore false and violates 15 U.S.C §§1692e and 1692g, 225 ILCS 425/9, and 225 ILCS 425/9.3.

## CLASS CERTIFICATION REQUIREMENTS

2.　　All requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been met.

3.　　It is reasonable to infer from the following facts that the number of class members exceeds the approximately 40 required for certification in that:

a.　　This action complains of a standard form used by Defendant; Appendix A is a form letter used by Defendant as evidenced by the form designation in the bottom right hand corner: AFNIR2;

b.　　Defendant purchases between 40,000 and 50,000 accounts each month (480,000 - 600,000 per year) from Cingular Wireless alone (Appendix B, p. 28).

c.　　Cingular Wireless is not the only creditor defendant purchases accounts from.

d.　　If Defendant sent a letter in the form of Appendix A in only 1 out of every 100 accounts, counting only the Cingular Wireless accounts, it would be sent to some 4,800 persons, of which about 8% (if AFNI holds debts in Illinois, Indiana and Wisconsin proportional to the national population) live in the three states covered by the class definition (according to the U.S. Census Bureau statistics at http://quickfacts.census.gov/qfd/ Illinois, Indiana, and Wisconsin contain about 8.3% of the national population), and the class would consist of between 384 and 480 persons.

4.　　Plaintiff will obtain the exact number of class members through discovery, and requests a briefing schedule long enough to obtain such information.

5.　　There are questions of law and fact common to the class, which questions

predominate over any questions affecting only individual class members.  The primary question is whether defendant's practice of sending letters in the form of <u>Appendix A</u> violates the FDCPA and the ICAA.

6.    Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

7.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.  (<u>Appendix C</u>).

8.    A class action is superior to other alternative methods of adjudicating this dispute, in that:

a.    Congress specifically contemplated FDCPA class actions as a principal means of enforcing the statute;

b.    A class action is necessary to determine that defendant's conduct is a violation of law and bring about its cessation.

9.    In further support of this motion, plaintiff submits the accompanying memorandum of law.

10.    Plaintiff is filing a class certification motion at this time because of the decision in <u>White v. Humana Health Plan, Inc.</u>, 06 C 5546, 2007 U.S. Dist. LEXIS 32263 (N.D. Ill., May 2, 2007).

WHEREFORE, plaintiff respectfully requests that this Court enter an order determining that this action may proceed as a class action.

Respectfully submitted,

<u>s/Daniel A. Edelman</u>
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## LIST OF APPENDICES

A      Letter sent to plaintiff Bouke Hale dated May 9, 2008

B      *Seeger, et al., v. AFNI, Inc*., 05-C-714 (ED Wis.), Transcript, Deposition of Jim Hess, July 25, 2006

C      Declaration of Daniel A. Edelman

### CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on August 19, 2008, I caused to be filed the foregoing document via the CM/ECF System, which notification of such filing to the following parties via electronic mail:

Justin M. Penn
jpenn@hinshawlaw.com


s/Daniel A. Edelman
Daniel A. Edelman


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

# APPENDIX A

P.O. Box 20939
Ferndale, MI 48220





404 Brock Drive
P.O. Box 3427
Bloomington, IL 61702-3427
Please remit to Bloomington, IL address

05/09/2008

BOUKE HALE



Illddilulllellendildilleullldildeluilldellndilldendildi

Afni, Inc. Account #: 29-02
Creditor Account #: ████████0806

Balance Due:    $267.43

We have received your dispute but we are unable to investigate at this time. You have provided insufficient information to substantiate your claim. We will complete our investigation within 30 days of receipt of the following information:

- The specific information you dispute
- An explanation of the basis of your dispute.
- All supporting documentation to substantiate your claim. Examples may include but is not limited to, photocopy of your driver's license, the identification page of your passport, proof of residency at time of service, receipts, etc.
- A valid phone number to contact you.

Please contact our office to resolve this matter.

Monday–Friday, 7am – 7pm CST. Toll Free: (866) 857-7203

This communication is from a debt collector. Any information obtained will be used for that purpose. You have the right to inspect your credit.

Sincerely,
Afni, Inc.

# APPENDIX B

**1**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

MARVIN SEEGER, BRADLEY )
GAMROTH, ROBERT )
MCCLAIN, AND JOANNE )
BLAREK, )
    )
        Plaintiffs, )
    )
    vs. ) No. 05-C-714
    )
AFNI, INC., )
    )
        Defendant. )

THE DEPOSITION of JIM HESS, called as a witness by the plaintiffs in the above entitled cause, taken before me, Cindy M. Scribner, CSR-RPR, License #084-004465, a Notary Public in and for the County of Peoria and State of Illinois, at the Interstate Center, in the City of Bloomington, County of McLean and State of Illinois, on the 25th day of July, A.D. 2006, commencing at 3:00 p.m.

Advantage Reporting Service

---

**3**

\*\*\*\*\*\*\*\*

I N D E X

Examination by:

Mr. Blythin          Page 4

Mr. Schultz          Page 74

(Exhibits 1-7 were marked for identification purposes and are attached to the back of the transcript.)

---

**2**

APPEARANCES:

Ademi & O'Reilly
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
By: J.D. Blythin, Esq.
    For the plaintiffs;

Hinshaw & Culbertson
222 North LaSalle Street, Suite 300
Chicago, IL 60601
(312) 704-3000
By: David M. Schultz, Esq.
    For the defendant.

---

**4**

JIM HESS,

being first duly sworn, deposes and says as

follows, in answer to:

EXAMINATION BY MR. BLYTHIN:

Q.    Could you state your name for the record, please, and spell your last name?

A.    James R. Hess, H-E-S-S, as in Sam.

Q.    And what's your home address?

A.    15918 Inverrary, I-N-V-E-R-R-A-R-Y, Lane, Bloomington, Illinois, 61704.

Q.    My name is John Blythin, I'm an attorney with the firm of Ademi & O'Reilly in Cudahy, Wisconsin. I'm here to ask you questions about the suit that's in federal court in Milwaukee, Eastern District of Wisconsin, called Seeger versus AFNI; are you familiar with that case?

A.    Yes, I am.

Q.    Now, are you represented by counsel?

A.    Yes, I am.

Q.    And can you identify your counsel?

A.    David Schultz.

5

1    Q.   You just took an oath that the
2  court reporter read -- stated to you.  You
3  understand -- do you understand that that oath
4  is the same oath that you would take in a
5  court of law and your answers are made subject
6  to penalty of perjury?
7    A.   Yes.
8    Q.   Some initial things to go over that
9  every lawyer goes over in depositions -- in
10  the beginning of a deposition.  If you need to
11  take a break, that's fine, just ask and we can
12  do it.  The only thing is that if there's a
13  question pending, please you need to answer
14  the question before you take a break.  Do you
15  understand that?
16    A.   Yes.
17    Q.   Your answers should be audible
18  meaning the court reporter is taking down a
19  transcript and it's going to be printed
20  material.  If I ask you a question that can be
21  answered yes or no, please say yes or no and
22  not uh-huh or huh-uh, or things like that,
23  because those don't translate to print.  Okay?

6

1    A.   All right.
2    Q.   Also make sure that you're loud
3  enough for everybody to hear.   You can confer
4  with your counsel, but, again, please do that
5  after you answer a question; do you understand
6  that?  If I ask you a question --
7    (An of the record discussion was held.)
8          MR. SCHULTZ:  If you're not sure
9  you understand a question, tell him that.
10  BY MR. BLYTHIN:
11    Q.   If I ask you a question and you
12  don't understand it, you can ask me to
13  rephrase it or say it again or ask the court
14  reporter to read it back.
15    A.   Okay.
16    Q.   If you do answer a question, I'll
17  assume that you understood it.
18    A.   Uh-huh.  Okay.
19    Q.   Okay.   Have you ever been deposed?
20    A.   Yes.
21    Q.   How many times approximately?
22    A.   Twice.
23    Q.   And were they -- were those

7

1  depositions in your employment with AFNI?
2    A.   Yes.
3    Q.   What kind of cases were they in?
4    A.   They were -- I don't actually
5  recall.  They were both collections practice
6  cases, FDCPA cases, one involving a settlement
7  issue.  I don't remember what the first one
8  was.
9    Q.   Have you ever had to give testimony
10  before in a civil trial in court?
11    A.   No.
12    Q.   Have you ever had to give testimony
13  in a criminal trial?
14    A.   Yes.
15    Q.   Were you accused of anything?
16    A.   No.
17    Q.   I don't want to get too into that
18  because --
19    A.   I was on the plaintiff's side.
20    Q.   Have you ever been a party to a
21  lawsuit other than -- say you personally been
22  party to a lawsuit?
23    A.   No.

8

1    Q.   Do you understand that this is a
2  deposition pursuant to Federal Rule of Civil
3  Procedure 30B6?  What that means is you're
4  testifying on behalf of the corporation, AFNI,
5  right, and your answers that are related to
6  the items -- so we should mark this first.
7    (An off the record discussion was held.)
8    (Deposition Exhibit No. 1 was marked for
9  identification purposes.)
10  BY MR. BLYTHIN:
11    Q.   Have you seen this document before?
12    A.   Yes.
13    Q.   When did you read it?
14    A.   I read it this morning.
15    Q.   Going back a little bit, I don't
16  remember if I ever asked you -- I don't
17  remember if I asked you what your position
18  was, your job?
19    A.   Director of business development.
20    Q.   Who's your employer?
21    A.   AFNI, Inc.
22    Q.   And is AFNI short for something?
23    A.   No.

9

1    Q.   Where's the headquarters for AFNI?

2    A.   **Bloomington, Illinois.**

3    Q.   Do you operate in any other states?

4    A.   **Yes.**

5    Q.   How many states?

6    A.   **We operate in Illinois, Arizona,**

7    **Missouri, Kentucky, Texas, Alabama.  I think**

8    **that's it.**

9    Q.   Is that -- are those states where

10   you have a physical presence?

11   A.   **Those are states where we have a**

12   **physical presence.**

13   Q.   And what kind of facilities do you

14   have starting out in Illinois?

15   A.   **You want all the specific locations**

16   **and what they do or size of facilities?**

17   Q.   What I was -- what I want is, first

18   of all, how many separate facilities does AFNI

19   have in the State of Illinois?

20   A.   **Five.**

21   Q.   One of them I assume is the

22   corporate headquarters?

23   A.   **Corporate headquarters.**

10

1    Q.   What else does AFNI have here in

2    terms of staff?

3    A.   **Martin Luther King facility here in**

4    **Bloomington, which is our credit and**

5    **collection center, which is where all of our**

6    **credit and collection activities are carried**

7    **out.  Then we have two facilities on Wiley**

8    **Drive, which are outsourced**

9    **noncollection-related functions, call center**

10   **operations and subrogation collections for the**

11   **insurance industry.  Peoria, Illinois, is our**

12   **fifth facility in the State of Illinois, and**

13   **it is a customer care facility.**

14   Q.   Are the facilities in other states

15   similar facilities, do they do the same

16   things?

17   A.   **They're similar to the Peoria**

18   **facility in that they are all call center**

19   **operations, inbound customer care operations,**

20   **outside of our St. Charles, Missouri,**

21   **facility, which is a subrogation collections**

22   **facility for the insurance industry.**

23   Q.   You mentioned the Martin Luther

11

1    King facility, is that on Martin Luther King

2    Boulevard, Street?

3    A.   **Martin Luther King Drive.**

4    Q.   In Bloomington?

5    A.   **Uh-huh.**

6    Q.   You said that's where the credit

7    and collection operations takes place?

8    A.   **Yes.**

9    MR. BLYTHIN:  Go off the record for

10   one second.

11   **(An off the record discussion was held.)**

12   MR. BLYTHIN:  Back on.

13   BY MR. BLYTHIN:

14   Q.   Looking at Deposition Exhibit 1,

15   the notice of deposition, you stated before

16   that you read this document this morning,

17   correct?

18   A.   **Uh-huh.**

19   Q.   When you read items 1 through 8 --

20   A.   **Yes.**

21   Q.   -- did -- is there anything on that

22   list of eight topics that you are not able to

23   testify about here?

12

1    A.   **No.**

2    Q.   You are able to testify about

3    everything?

4    A.   **Yes.**

5    Q.   And the other two regarding

6    documents, have you brought all the documents

7    that were responsive to numbers one and two

8    that -- let's see, to the deposition with you?

9    A.   **Yes.**

10   MR. SCHULTZ:  I just have to

11   qualify that with the caveat that I mentioned

12   to you on the phone previously in addition to

13   what has already been produced by us in

14   discovery.  I wasn't positive if a few pages I

15   had brought had been produced yet or not.

16   MR. BLYTHIN:  No, they hadn't, but

17   thanks.

18   BY MR. BLYTHIN:

19   Q.   Are you currently taking any

20   medications that may affect your ability to

21   testify here?

22   A.   **No.  I should be, but I'm not.**

23   MR. SCHULTZ:  Let the record

13

1  reflect that is humor and a joke.
2          MR. BLYTHIN:  As far as I'm
3  concerned, depositions need more humor.
4  BY MR. BLYTHIN:
5      Q.   What specifically did you do to
6  prepare for this deposition?
7          MR. SCHULTZ:  I just caution you to
8  not divulge privileged information, meaning
9  the content of conversations you and I had.
10 You can discuss generally what was done
11 though.
12 BY MR. BLYTHIN:
13     Q.   What I was asking was generally --
14 I'm sure you met with your attorney, correct?
15     A.   Yeah.  Well, it started obviously
16 when the original complaint was filed.  I was
17 made aware that a complaint was filed through
18 our paralegal, who we have a standing review
19 meeting typically once a month to go through
20 all the pending cases and receive updates on
21 where we were and determine our course of
22 action based on her interactions with outside
23 counsel.  So I was aware of this some months

14

1  ago and kind of been following it and then
2  made aware that a deposition would be coming
3  up and I would need to get scheduled for that.
4  And sort of familiarize myself with the
5  accounts at hand.  Read the complaint a couple
6  times, understood what the complaint was, you
7  know, and just mentally went through the
8  process of, you know, thinking back as it
9  related to these eight questions, what's our
10 policy and procedure and the processes that we
11 went through, just a recollection.
12     Q.   Did you meet with your attorney
13 prior to this deposition to prepare for it?
14 Not asking you the specifics of what you
15 talked about.
16     A.   Yes.
17     Q.   For approximately how long?
18     A.   45 minutes.
19     Q.   Was anybody other than you and
20 Mr. Schultz there?
21     A.   Yes.
22     Q.   Who was there?
23     A.   Lisa Anderson, she's our paralegal.

15

1      Q.   Was she the paralegal you mentioned
2  before who was in that meeting?
3      A.   Uh-huh.
4      Q.   You say you have monthly meetings
5  regarding cases?
6      A.   Try to.
7      Q.   Is that cases against AFNI?
8      A.   Yes.
9      Q.   Approximately how many cases are
10 there pending against AFNI right now?
11     A.   10.
12     Q.   Are they all FDCPA cases?
13     A.   No.
14     Q.   Some of them state law?
15     A.   Yes.
16     Q.   There's some completely unrelated
17 to collection?
18     A.   I wouldn't say they're unrelated,
19 but it's, I mean, fact FDCPA is the biggest
20 new one that's rearing its ugly head.
21     Q.   No, I was --
22     A.   All collection related.
23     Q.   So there aren't any lease disputes

16

1  or anything like that?
2      A.   No.
3      Q.   Did you look at any -- sorry,
4  strike that.
5          Did you look at any documents to
6  prepare for this lawsuit?
7      A.   Yes.
8      Q.   And you stated that you brought
9  them, the ones that hadn't been produced in
10 discovery yet?
11     A.   Correct.
12     Q.   Did you look at the documents
13 specifically that had been produced before
14 that include the account notes or plaintiff's
15 records?
16     A.   Briefly.
17     Q.   Did you review any other sources of
18 information that are not printed on computer
19 or otherwise?
20     A.   No.
21     Q.   Did you look at anything
22 specifically to get up to speed on likely
23 topics for this deposition?

17

1    A.    No.
2    Q.    Did you look at things you had
3  looked at before but not produced?
     A.    No.
     Q.    Did you look at anything
6  specifically to refresh your memory about
7  anything?
8    A.    Yes.
9    Q.    What did you look at?
10    A.    Well, I reviewed the complaint
11  again, obviously looked at the notice of
12  deposition, and then I reviewed the -- this
13  ACA document that we have brought with us
14  today.
15    Q.    Was that it?
16    A.    Yes.
17    Q.    Do you know --
18    A.    And one more thing.  I did review
19  our debt sales contract with Cingular one more
20  time.
21    Q.    What's a debt sales?  Can you spell
22  that?
23    A.    Debt sale, D-E-B-T, sale contract,

18

1  which I believe was --
2    Q.    Oh, debt sale.  Do you know whether
3  everything requested in discovery so far has
4  been -- that is in AFNI's possession has been
5  produced?
6        MR. SCHULTZ:  I object to
7  foundation of it.  You haven't established --
8  I'm very confident he's not the person that
9  would be involved with all the production
10  issues in the case.
11  BY MR. BLYTHIN:
12    Q.    Who would be --
13        MR. SCHULTZ:  I think it's counsel,
14  Miss Anderson probably most likely.  I'll
15  certainly follow up to investigate if there's
16  a document missing, if you feel there's
17  something missing.  I'll work on that.
18        MR. BLYTHIN:  No, I was just
19  asking.
20        THE WITNESS:  I don't know of
21  anything, but there might have been something.
22  BY MR. BLYTHIN:
23    Q.    Did you talk to anybody other than

19

1  your counsel and Miss Anderson to prepare for
2  this deposition?
3    A.    No.
4    Q.    Did you talk to anybody else about
5  the deposition?
6    A.    Yes.
7    Q.    Who did you talk to?
8    A.    My wife.  Just the fact that I had
9  to go to a deposition, not the nature of the
10  deposition.
11    Q.    I'm not going to call your wife.
12  Are you aware that we had made -- sorry,
13  strike that.
14        Are you aware that plaintiffs in
15  this case had made requests for documents and
16  records previously in this case?
17    A.    I don't recall that they did, no.
18  I'm sure it's in the account notes if they
19  did.
20    Q.    Do you know whether anybody other
21  than counsel or Miss Anderson looked for the
22  documents either for this deposition or for
23  the production to written requests?

20

1    A.    I'm not aware of specifically who
2  would have assisted Lisa in gathering the
3  documentation, but typically she would have
4  support staff help for the gathering of the
5  documentation.
6    Q.    Just a few more background
7  questions and then we can get into the heart
8  of things, I guess.  Where were you born?
9    A.    Peoria, Illinois.
10    Q.    What year?
11    A.    1965.
12    Q.    What post secondary education do
13  you have?
14    A.    Illinois State University.
15    Q.    Do you have a BA, BS?
16    A.    BA.
17    Q.    Anything other than that?
18    A.    No.  Well, I'm an ACA scholar, kind
19  of like a JD in the collection agency
20  industry.
21    Q.    When did you start working for
22  AFNI?
23    A.    1991.  June 4th, 1991.

21

1    Q.  You remember the day?

2    A.  **It's a pretty historic day for the**

3    **company.  No, I just celebrated 15 years, and**

4    **so it's -- I get a card on that day every year**

5    **it seems like, so I kind of remember it.**

6    Q.  What jobs -- what job did you do

7    immediately preceding going to work for AFNI?

8    A.  **Prior to AFNI I worked for TCI**

9    **cable company.**

10   Q.  In Bloomington?

11   A.  **Here in Bloomington, yes.**

12   Q.  What years did you -- how long did

13   you work there?

14   A.  **I worked there from 1988 to 1991.**

15   Q.  When did you graduate from Illinois

16   State University?

17   A.  **'89.**

18   Q.  So did you have jobs before going

19   to -- strike that.

20       Did you have another job either

21   while you were in college or before that?

22   A.  **Yes.**

23   Q.  What were they immediately --

22

1    starting immediately before 1989 or you

2    started working for TCI?

3    A.  **Bloomington School District.**

4    Q.  What did you do for the school

5    district?

6    A.  **I was a janitor.**

7    Q.  And before that?

8    A.  **I worked at a meat processing**

9    **plant.  I had a lawn mowing business for eight**

10   **years as well from the time I was 12 until I**

11   **was --**

12   Q.  I was about to say --

13   A.  **How far back are we going to go?**

14   Q.  -- if we get back to high school,

15   you can stop there.  Do you belong to any

16   social organizations or clubs?

17   A.  **No.**

18   Q.  So when you started working at AFNI

19   on June 4th, 1991, what was your first job

20   there?

21   A.  **Bill collector.**

22   Q.  How long were you bill collector?

23   A.  **I was a bill collector for two**

23

1    years, approximately two years.

2    Q.  To 1993?

3    A.  **Yes, about '93.**

4    Q.  And you were promoted, I assume?

5    A.  **Yes.**

6    Q.  In 1993 to what?

7    A.  **Branch manager, Little Rock,**

8    **Arkansas.**

9    Q.  And how long were you that, the

10   branch manager for Little Rock, Arkansas?

11   A.  **Nine months.**

12   Q.  And then after that?

13   A.  **Branch manager, Hershey,**

14   **Pennsylvania.**

15   Q.  For how long?

16   A.  **It was about a five-month stint,**

17   **five, six months.**

18   Q.  Is it normal in the company to be

19   moving around branch managers that much?

20   A.  **No, I was probably the only one who**

21   **ever did that.  We consolidated all of our**

22   **operations in '94, early '94, brought all of**

23   **our business back to Bloomington/Normal.  We**

24

1    built the company from there.

2    Q.  So once we get up to 1994 -- so you

3    were the branch manager in Hershey for about

4    five months, probably getting at least pretty

5    close to '94 then.  Where was your position

6    after that?

7    A.  **After the branch manager's position**

8    **in Hershey?**

9    Q.  Yes.

10   A.  **When I came back to Bloomington, I**

11   **became a portfolio manager.**

12   Q.  What's the difference between a

13   portfolio manager and a branch manager?

14   A.  **Branch manager would manage**

15   **collection, floor execution, call execution**

16   **with collection staff itself.  When I became**

17   **the portfolio manager, I was responsible for**

18   **the lines of business.  So I had client**

19   **relationship responsibilities, global**

20   **portfolio performance responsibility.**

21   Q.  What lines of business are there?

22   A.  **The specific ones I represented**

23   **were all of our third-party debt collection**

25

1  lines of business and debt purchase
2  operations.   It's the agency, the collection
3  agency side of our business.
4       Q.   And how long were you portfolio
5  manager?
6       A.   Fundamentally always had that job
7  since, it's just morphed into more
8  responsibility and higher job grade and title,
9  but I fundamentally do the same thing.
10      Q.   What was your current position?
11      A.   Director.
12      Q.   How many portfolio managers are
13 there in the company?
14      A.   In the agency?
15      Q.   Right.
16      A.   One.
17      Q.   How many branch managers are there?
18      A.   We don't per se have branches any
19 longer.  We have center directors.  And so
20 there are -- there's a director for every
21 center we have.  So we probably have ten
22 center directors.  But in terms of collection,
23 the agency, there's one.  I have a peer who's

26

1  responsible for floor execution.
2       Q.   So am I correct in assuming that
3  the managers that are at those other sites are
4  essentially what you were talking about with
5  the branch managers before they were managing
6  the floor operations?
7       A.   Yes.
8       Q.   But you are managing the collection
9  side of business from Bloomington?
10      A.   Correct.
11   (Deposition Exhibit No. 2 marked for
12 identification purposes.)
13   BY MR. BLYTHIN:
14      Q.   We've marked a document or group of
15 documents really as Exhibit 2, can you
16 identify the first four pages of this Exhibit
17 2?  You can take a look at that and hand it
18 back.
19      A.   These are screen prints of the
20 notes section of an account ledger.
21      Q.   Do you know whose account that was?
22      A.   Marvin Seeger.
23      Q.   And do you know who the creditor

27

1  was?
2       A.   I do know.  I cannot tell by the
3  pages that you've delivered to me.
4       Q.   Do you know who it was disregarding
5  those pages being in front of you?
6       A.   Okay.   And the question was again,
7  please?
8       Q.   Who's the creditor of Mr. Seeger's
9  account?
10      A.   The original creditor was Cingular
11 Wireless.
12      Q.   Did AFNI purchase these --
13 Mr. Seeger's account from Cingular, or are
14 they just collecting it on their behalf?
15      A.   We purchased this account.
16      Q.   What -- strike that.
17           How long ago did they, did AFNI,
18 purchase that?
19      A.   This one, without seeing the exact
20 front page, based on the load date that I see,
21 would have been in a portfolio that we
22 purchased in September of 2004.
23      Q.   And approximately how many other

28

1  Cingular accounts were in that portfolio?
2       A.   I have no idea.
3       Q.   Were there only Cingular accounts
4  in that portfolio?
5       A.   Yes.
6       Q.   From your experience approximately
7  -- can you make an estimate as to how many are
8  normally in a portfolio like that?  And it
9  doesn't have to be a specific number, it could
10 be a range if that's the extent of your
11 knowledge on that.
12      A.   Our existing forward flow contract
13 with Cingular, we typically buy between 40,000
14 and 50,000 accounts a month in the global
15 Cingular purchase agreement.
16      Q.   How are those accounts transmitted
17 from Cingular to AFNI?
18      A.   They are encrypted on a CD-rom and
19 sent via overnight to us once a month.
20           MR. BLYTHIN:  Off the record.
21   (An off the record discussion was held.)
22           MR. BLYTHIN:  Back on.
23   BY MR. BLYTHIN:

29

1      Q.   Exhibit -- in regard to Exhibit 2,
2   are these -- do these documents show at all
3   what was sent from Cingular, or is this --
4      **A.   Yes.**
5      Q.   What account information is
6   typically sent from Cingular in regard to each
7   account that AFNI purchases?
8      **A.   Name, address, balance, phone**
9   **number, if they have a phone number, unique**
10  **Cingular account number, in-service date,**
11  **out-of-service date, charge-off date, contract**
12  **date, if they have it, specific geographic**
13  **market, so there's a market code, prior**
14  **payment activity, previous balance, past due**
15  **balance.**
16     Q.   Are you reading off --
17     **A.   Yes.**
18     Q.   -- this form?
19     **A.   Yes.  That's what's all identified.**
20  **This is inbound load notes from Cingular that**
21  **we -- credit class, delinquency date.  So this**
22  **whole first block that's LD, that's their data**
23  **coming in, streaming in.**

30

1      Q.   What's LD stand for?
2      **A.   It just means load notes, load.**
3      Q.   And the streamed data, does that --
4   it's on the CD-rom, you then upload the data
5   into your computer system?
6      **A.   Uh-huh.**
7      Q.   What program do you use to
8   translate the raw data from this into a semi-
9   readable screen?
10     **A.   Well, the load program itself is**
11  **written in RPG.  So it's RPG code that loads**
12  **to the Intelec collection system.**
13     Q.   Entella collections?
14     **A.   Intelec system is the name of the**
15  **system screens you're looking at.**
16     Q.   Is it I-N-T --
17     **A.   I-N-T-E-L-E-C collection system.**
18     Q.   And that's the one that AFNI uses?
19     **A.   That is our system, yes.  So**
20  **basically we take their data elements, RPG**
21  **program, map them to our file fields.**
22     Q.   Are these in Exhibit 2 any
23  particular order -- the entries, are they in

31

1   any particular order?
2      **A.   Time.   They all run time order**
3   **sequentially from the first to the last or the**
4   **most current.  So you can see their time and**
5   **date stamped.  Date, time.**
6      Q.   Is there anything on here that
7   would indicate that Cingular is including an
8   amount as a collection fee?
9      **A.   Is there anything on here that**
10  **would indicate that they are?  No.  They don't**
11  **include collection fees.**
12     Q.   But is there -- do they send you
13  anything saying that -- do they send AFNI
14  anything that identifies that there would be a
15  collection fee in the contract allowable?
16     **A.   In the contract they do not**
17  **prohibit us from adding fees and/or interest**
18  **or any charges that we are legally able to**
19  **add.   So they do not prohibit us from doing**
20  **so in the contract.**
21     Q.   Well, I guess what I was trying to
22  get at was the -- I would assume that a
23  collection fee would be coming from the

32

1   Cingular contract itself, correct?  The
2   Cingular contract would specify --
3      **A.   Which contract?  We're probably**
4   **referring to different contracts.**
5      Q.   The --
6      **A.   Customer service agreements?**
7      Q.   Yes, the customer service
8   agreement.
9      **A.   The customer service agreement --**
10  **Cingular's customer service agreement**
11  **authorizes the addition of a collection fee**
12  **and/or attorneys fees, that's a standard**
13  **clause that's in all of them in the event that**
14  **they have to, you know, basically charge the**
15  **accounts to collect the account.  It is a**
16  **standard tag line that's on every service**
17  **agreement for every carrier across the**
18  **country.   But that's just saying that they're**
19  **giving the customer notification that they**
20  **could do it.  That's all it's saying.**
21     Q.   And would this Exhibit 2 look
22  essentially the same for a -- strike that.
23          Cingular sends you in those bundles

33

1  of data accounts for customers in many
2  different states?
3       A.   Yes.
         Q.   They're all together, correct?  Let
5  me clarify that.  Specifically a group of
6  those 40- to 50,000 would include -- would
7  probably likely include customers -- Cingular
8  customers in Alaska, Alabama, New Jersey.
9       A.   Wherever they have service
10  territories, yes.
11      Q.   And are they organized by state?
12      A.   Yes.
13      Q.   Is there --
14      A.   Geographic regions, segmentation,
15  yes.
16      Q.   Well, is it organized by state or
17  are their geographic regions, multi-state?
18      A.   There are multiple MSA's in given
19  states.
20      Q.   What's an MSA?
21      A.   That's a terminology for -- in the
22  cellular industry for just a market cluster, a
23  market segment.  Bloomington/Normal is an MSA.

34

1  So we could have four MSA's in Illinois.
2       Q.   So theoretically there could also
3  be, for example, Chicago MSA might include
4  Gary, Indiana?
5       A.   No.  Typically will not cross
6  state lines for franchise taxing reasons.
7       (Exhibit No. 3 marked for identification
8  purposes.)
9  BY MR. BLYTHIN:
10      Q.   Are you familiar with the document
11  marked as Exhibit 3?
12      A.   No.
13      (An off the record discussion was held.)
14  BY MR. BLYTHIN:
15      Q.   Do you know what it is?
16      A.   I assume you made some changes to
17  the original complaint, added some additional
18  parties or something.  No.
19      Q.   Were you familiar with the original
   complaint?
21      A.   Yes.
22      Q.   The amended complaint added -- as
23  background, it added some other plaintiffs,

35

1  but essentially didn't really change the
2  topics.   Would you turn to Exhibit A of
3  Exhibit 3.
4       A.   Yes, sir.
5       Q.   Can you identify this document?
6       A.   Yeah, this is a first notice
7  letter.  So this is AFNI's first notice that
8  we would send to a customer notifying them of
9  the account.
10      Q.   How much of this is a form
11  document?
12      A.   90 percent of it.
13      Q.   So which -- can you identify in
14  this letter who it was mailed to?
15      A.   Yes, Marvin Seeger.
16      Q.   And can you identify what portions
17  of this letter were specific to Mr. Seeger?
18      A.   Yes.   Upper left-hand corner,
19  date, 9-27-04, his name and address, the
20  account number -- not the AFNI, Inc., account
21  number portion of it, but 007445744-02.
22  Cingular, the creditor account number.
23      Q.   You don't need to read the number,

36

1  it's on the document.
2       A.   Social Security number, original
3  balance, collection fee, balance due.
4       Q.   And then I assume on the bottom?
5       A.   Same information on the other
6  stuff.
7       Q.   How did AFNI come up with a
8  collection fee in the amount of 1587?
9       A.   We add 15 percent to the principal
10  balance.
11           MR. BLYTHIN: Off the record.
12      (An off the record discussion was held.)
13           MR. BLYTHIN: Back on.
14  BY MR. BLYTHIN:
15      Q.   And I believe you said earlier --
16  make sure we confirm this, that AFNI does --
17  AFNI adds the collection fee amount without
18  Cingular specifically telling them how much to
19  add?
20      A.   That's correct.
21      Q.   Turn to Exhibit 3, Exhibit B, can
22  you identify this document?
23      A.   This is another first notice

37

1  letter.
2      Q.  Do you know who it was sent to?
3      A.  **Bradley Gamroth.**
       Q.  And the -- is the specific account
5  information the same type of information as
6  the Seeger letter?
7      A.  **Yes.**
8      Q.  And is the collection fee of 5044
9  also 15 percent of the balance?
10     A.  **Correct.**
11     Q.  Do you always add 15 percent to the
12  balance?  If I went through all these letters
13  and calculated the amount listed as the
14  collection fee, would it always be
15  approximately 15 percent?
16     A.  **If within the state we are allowed**
17  **to add the fee to our understanding, yes, it**
18  **would be 15 percent.**
19     Q.  So if you turn to Exhibit C, the
20  same?
21     A.  **Yes.**
22     Q.  And Exhibit D -- strike that.
23         How about Exhibit E, because

38

1  Exhibit E is a different letter.
2      A.  **Yes, E is a first notice, straight**
3  **15 percent.**
4      Q.  Going back to Exhibit D here,
5  assuming that Exhibit C here is -- which is
6  also sent to Mr. McClain, correct?
7      A.  **Uh-huh.**
8      Q.  That amount on Exhibit D would also
9  include the collection fee added to the
10  balance?
11     A.  **Uh-huh.**
12     Q.  Does Cingular ever send AFNI a
13  generic contract -- strike that.
14         Did Cingular ever send to AFNI a
15  generic contract or service agreement between
16  a customer and Cingular that would specify
17  what's, you know -- what fees they can
18  collect?
19     A.  **Yes.**
20     Q.  How often do they do that?
21     A.  **I don't think there's a number.**
22  **It's something that we have historically**
23  **reviewed.  It's in the general practice of**

39

1  business.
2      Q.  Do they generally send you a new
3  service agreement -- new sort of generic
4  service agreement if it changes?
5      A.  **They would not automatically do**
6  **that.**
7      Q.  Does AFNI service debts for any
8  companies as opposed to purchasing them?
9      A.  **Yes.**
10     Q.  Approximately how many?
11     A.  **Ten.**
12     Q.  Approximately how many companies
13  does AFNI buy debts from?
14     A.  **Six.**
15     Q.  Does AFNI service any Cingular
16  debts in addition to buying from them?
17     A.  **No.**
18     Q.  So who are some of those --
19         MR. SCHULTZ:  If you start getting
20  beyond -- go ahead.
21         MR. BLYTHIN:  What?
22         MR. SCHULTZ:  Go ahead.
23         MR. BLYTHIN:  If I go beyond the

40

1  scope, you can go ahead and have a standing
2  objection to the line of questioning and it
3  will be on your knowledge and not of the
4  company's, you know, not binding the company
5  is how it works.  But to avoid making an
6  objection to every question I ask in this
7  specific line --
8         MR. SCHULTZ:  I may misinterpret
9  where you're going beyond this, but if you're
10  going to start going beyond Cingular accounts,
11  I may direct him not to answer.  But I know
12  it's an unusual step, but because of the
13  nature of your firm, your practice and the
14  type of business.
15         MR. BLYTHIN:  I understand.  I was
16  only going to go in for a background, not
17  anything specific.   But if it's going to
18  raise an issue, I might not worry about it.
19         Can we go off the record?
20         MR. SCHULTZ:  Sure.
21  (An off the record discussion was held.)
22  BY MR. BLYTHIN:
23     Q.  Sticking with Cingular accounts

41

1  specifically, you said before that AFNI
2  purchased these plaintiffs' accounts, correct?
3      A.  **Yes.**
        Q.  And purchased them from Cingular?
5      A.  **Correct.**
6      Q.  Is AFNI still the current owner
7  listed as the current owner of these accounts?
8      A.  **Yes.**
9      Q.  Recognizing that I believe all of
10  them are involved in bankruptcies that either
11  have been discharged or in the process?
12      MR. SCHULTZ:  To the best of your
13  knowledge.
14  BY MR. BLYTHIN:
15      Q.  To the best of your knowledge.
16      A.  **Yeah.**
17      Q.  But AFNI would still be listed as
18  owning the account, correct?
19      A.  **Not in the case of bankruptcy.**
20      Q.  What would happen in the case of
21  bankruptcy?
22      A.  **Depending on the time at which the**
23  **bankruptcy occurred, the accounts could have**

42

1  **been sold back to Cingular.**
2      Q.  Could have been?
3      A.  **Yes.**
4      Q.  So you don't always?
5      A.  **And I'll clarify.  If the**
6  **bankruptcy occurred prior to our acquisition**
7  **of the account, we have a right to sell the**
8  **accounts back in our prescrub when we load.**
9  **If the bankruptcy occurs after we've taken**
10  **ownership of it, we take the hit.**
11      Q.  So it's essentially like returning
12  a defective product?
13      A.  **Right.**
14      Q.  Do you ever -- I'm sorry, does AFNI
15  ever purchase individual accounts from
16  Cingular, or was it always in those big
17  bundles?
18      A.  **Big, large portfolios.**
19      Q.  Portfolios?
        A.  **Yes.**
21      Q.  So you stated before, too, that the
22  Cingular accounts are all over the country,
23  correct?

43

1      A.  **Yes.**
2      Q.  Are you aware of any states where
3  there are no Cingular accounts for that you
4  are sent?
5      A.  **I'll clarify.   We purchase out of**
6  **known Cingular servicing regions.   So that's**
7  **where the accounts were originated, so it's**
8  **states of origination.  The customer**
9  **subsequently could have moved to a different**
10  **state, which is why we would -- I would be**
11  **hard pressed to say that there is a single**
12  **state where there is not a Cingular customer's**
13  **account that we own that they don't reside in.**
14  **But the bulk of them are more geographically**
15  **isolated to certain regions of the country.**
16      Q.  So what I was getting at, are you
17  aware of any specific state or area where for
18  one reason or another, including, for example,
19  that you're not allowed to collect those debts
20  there?
21      A.  **Yes.**
22      Q.  Or that there aren't any Cingular
23  accounts that you're attempting to collect?

44

1      A.  **Could you rephrase the question?**
2      Q.  Yeah.   Are you aware of any
3  specific areas of the country where AFNI does
4  not attempt to collect or obtain debts from
5  Cingular to collect because for one reason or
6  another it's prohibited?
7      A.  **Yes.**
8      Q.  What areas?
9      A.  **Connecticut.**
10      Q.  Why is that?
11      A.  **Because they have a goofy law on**
12  **the books from 1952 that prohibits collection**
13  **agencies from buying debt.**
14      Q.  Are there any others?
15      A.  **Not to my knowledge.**
16      Q.  Are there any states or areas --
17  just really specifically states -- where AFNI
18  modifies their collection -- their initial
19  collection letter as in Exhibit 3, Exhibits A
20  through E, to comply with specific local laws?
21      A.  **Yes.**
22      Q.  What are they?  Can you explain?
23      A.  **I'll give you a handful off the top**

45

1  of my head because I doubt I can tell you
2  every specific one.
3      Q.   Okay.
       A.   California has specific language,
5  Colorado has specific language, North Carolina
6  has specific language, New York has specific
7  language, City of Buffalo. It goes on and on
8  and on. We maintain a big -- a large
9  translation table of if it's this state, this
10 mailing address, insert this language.
11     Q.   Is that a table that's printed out
12 or is it on a computer?
13     A.   Computer.
14     Q.   And does that automatically do
15 stuff?
16     A.   Yes.
17     Q.   Can that be modified?
18     A.   It has to be modified because the
19 states continually change their laws about
20 what they want us to say.
21     Q.   So do you have in-house counsel to
22 keep track of changes of state laws?
23     A.   Not counsel in terms of an

46

1  attorney. We have a paralegal and a
2  compliance committee in place that we all are
3  trying to stay abreast of all of the sweeping
4  changes as they're occurring either in the
5  courts or legislative bodies, regulatory
6  bodies, across the country.   ACA newsletters,
7  bulletins.
8      Q.   Anything else?
9      A.   Debt Bar Association, the DBA,
10 releases changes as well. Obviously our
11 corporate counsel.
12     Q.   Your corporate counsel?
13     A.   Yes, Mr. Schultz' firm tries to
14 keep us abreast of changes as well.
15     Q.   Who's on the compliance committee?
16     A.   Lisa, myself, John O'Donnell, who's
17 our vice president of credit collection
18 operations.
19     Q.   Is that O-D-O-N-N-E-L-L?
       A.   Two N's, E-L-L. Debra Ciskey,
21 C-I-S-K-E-Y.
22     Q.   Spell that one more time.
23     A.   Debra, D-E-B-R-A, Ciskey,

47

1  C-I-S-K-E-Y.
2      Q.   What is she? What is her position?
3      A.   Director of training and
4  development.
5      Q.   Anybody else?
6      A.   No.
7      Q.   Is Mr. O'Donnell or Miss Ciskey an
8  attorney?
9      A.   No.
10     Q.   So --
11     A.   There would be one other person who
12 would be involved to some degree, and that
13 would be a gentleman in the finance
14 organization, Curt Oyer, O-Y-E-R, Curt with a
15 C.
16     Q.   O-Y-E-R?
17     A.   Yes.
18     Q.   And that's in the finance
19 department?
20     A.   Yes.
21     Q.   Is he an attorney?
22     A.   No.
23     Q.   When you draft -- sorry. Strike

48

1  that.
2          Who drafted specifically the letter
3  attached as Exhibit 3, Exhibit A, the initial
4  notice letter?
5      A.   Probably myself and one other
6  gentleman.
7      Q.   Who would that have been?
8      A.   Jeff Shephard. And this is
9  nothing more than a modification of our
10 existing third-party notice. It may have
11 changed a couple sentences. It wasn't like we
12 started from scratch and drafted this, it was
13 a form letter that was modified, 1997
14 probably.
15     Q.   Did you say you modified and
16 created -- you modified an existing letter to
17 create this one approximately in 1997?
18     A.   Yeah. I'm sure from the original
19 version to this version it's -- as Dave could
20 attest to -- has been watered down and watered
21 down. So there's more and more taken out of
22 it every year, say less and less and less.
23 Won't even put the names on it before long.

49

1    Q.   So once it's drafted -- once this
2    form letter was drafted or modified, who
3    looked at -- who reviewed it?
4        A.   It would go for review by outside
5    counsel. I believe they have a checklist they
6    go through. It's part of the ACA letter
7    approval group, that's all a part of our
8    qualification for E & O coverage.   So
9    basically the letters have to be signed off on
10   by outside counsel they meet certain
11   requirements.
12       Q.   Are you personally aware of any of
13   those requirements?
14       A.   Yes.
15       Q.   What is your best understanding of
16   those requirements?
17       A.   I could give you some line by line
18   details of it, or I could give you
19   philosophically what they're looking at.
20       Q.   Well, some line by line details
21   would be good.
22       A.   Name, original creditor, balance,
23   itemization of collection fee if you're adding

50

1    a collection fee, mini memoranda, generally
2    speaking, you know, no threats of litigation,
3    name of our company, our mailing address, our
4    phone number that we can be reached at, our
5    hours of operation. Those are the main ones.
6    It's basically you can't say anything beyond
7    that.  So have all the base elements that you
8    have to have and there's not much else there
9    beyond that. So it's not false -- you're not
10   making any false or misleading statements.
11   You're not telling them you're going to do
12   something you can't legally do.   That's it.
13   Validation notice obviously is the big one,
14   it's there and it's intact.
15       Q.   You'd be surprised how many people
16   don't do that.
17       A.   Try and change it. Why? It's
18   ridiculous.
19       Q.   So moving to the end of the
20   process, I guess, this was drafted, it was
21   reviewed and then it goes into a computer
22   system where -- is there a -- there's a
23   computer system that plugs in the individual's

51

1    data to it?
2        A.   The variable elements.
3        Q.   Right.
4        A.   So you have the base template and
5    then you have merge codes of variable data
6    that streams onto the document.
7        Q.   And what was the name of that
8    system?
9        A.   Intelec.
10       Q.   That's the same as you used to
11   upload the data is also to distribute it into
12   the form --
13       A.   Yes.
14       Q.   -- fields?
15       A.   Yes.
16       Q.   Then I believe one of the responses
17   to interrogatory or, you know, was -- said
18   that you had a letter vendor?
19       A.   Yes.
20       Q.   Who's that?
21       A.   This particular one is Diversified
22   in Detroit.
23       Q.   And how is it -- how are those

52

1    completed letter files sent for printing?
2        A.   They maintain the template on their
3    side and the letter translation tables. And
4    on a nightly basis, daily basis, we move a
5    file of the variable data, elements of the
6    flat file variable data that's put on a
7    secured FTP site. They move it down off of an
8    FTP site on a daily basis creating the
9    noticing documents and mail. So they're full
10   rendering house.
11       Q.   Is that your FTP site?
12       A.   I'm not sure which one, whether
13   we're putting them on ours and they're pulling
14   them, or we're putting it on theirs. I think
15   for Diversified we put it to theirs.
16       Q.   That's not the Fair, Isaac system,
17   is it?
18       A.   No.
19       Q.   When you get a load of data from
20   Cingular does anybody at AFNI take specific
21   steps to determine whether those debts are
22   valid?
23       A.   Yes.

53

1    Q.   What do they do?
2    A.   We have an upload scrub process
3 that we go through so we're -- it's primarily
4 a bankruptcy scrub and a deceased scrub. In
5 addition to that, there is an address scrub.
6 So we're trying to upgrade the address, and we
7 attempt to secure a phone number.
8    Q.   Do they search for bankruptcy
9 files?
10    A.   Yes.  It's searching Banko.  We
11 use LexisNexis which the backbone of their
12 bankruptcy scrub is Banko, B-A-N-K-O, which is
13 one of the most predominantly used.
14    Q.   And how about updating addresses,
15 phone numbers?
16    A.   LexisNexis as well, which is a
17 compilation merged datebase from TransUnion
18 and court records and public record
19 information.
20    Q.   Is there any person who's
21 responsible for making sure that AFNI is
22 taking steps to assure that the debts that
23 they're attempting to collect are valid?

54

1    A.   Well, we have compliance procedures
2 in place to make sure that those processes
3 run.
4    Q.   Okay.
5    A.   And I have staff analysts who
6 monitor that activity on a daily basis.  That
7 doesn't necessarily validate any debts, it's
8 just the best of our knowledge at that point
9 in time they're legally collectible.  And
10 hopefully we have a real person.
11    Q.   People responsible for -- to make
12 sure that AFNI is complying generically with
13 the law, specifically in collections issues,
14 are the compliance committee; is that right?
15    A.   Yes.  It's really an oversight
16 organization.  I mean, we hold every single
17 one of our employees accountable for operating
18 within the guidelines of the law.  So
19 everyone's responsible for compliance.
20        MR. BLYTHIN: Off the record.
21    (An off the record discussion was held.)
22    (Deposition Exhibits 4 and 5 marked for
23    identification purposes.)

55

1 BY MR. BLYTHIN:
2    Q.   These two documents marked Exhibits
3 4 and 5, can you identify these?
4    A.   It's the Marvin Seeger screen page,
5 it says account record, and Bradley Gamroth.
6    Q.   Are those the same as the ones
7 before, just faxed?
8    A.   No, actually you can print -- you
9 can print out of the AS400, out of the system
10 two different ways, so you can make it look
11 prettier or you can do a 400 printout in AS400
12 language and it looks like this.  It's the
13 same thing.  It's just what you print it off a
14 PC or you're printing off the mainframe is all
15 it is.  The data elements should be exactly
16 the same though.
17    Q.   I just wanted to clarify that
18 because they look a little different.  Yeah,
19 they essentially seem to have the same
20 information.
21    A.   They're identical.
22    Q.   Also, in Exhibit 2 there were some
23 statements included after those first four

56

1 pages here?
2    A.   Cingular final bill copies.  So
3 this is what would have actually been
4 generated to the customer.
5    Q.   Right.  Would AFNI have received
6 that after this lawsuit started or --
7    A.   Only if we requested them of
8 which --
9    Q.   So really the question is, would
10 AFNI as a matter of course receive statements,
11 the customer statements?
12    A.   As a matter of -- no, these are on
13 a per request only basis.  One off basis.
14 But as a matter of practice when the suit
15 would come in to Lisa, she would request them
16 in most cases, a validation step to check to
17 see if they're real.
18    Q.   So you mentioned before that ACA
19 process that you send out your letters to?
20    A.   Yes.
21    Q.   Are they -- do you know -- do you
22 know if they are examining the letters for
23 FDCPA evaluations specifically?

**57**

1    A.   I believe that FDCPA compliance is
2 the basis of the examination.
3    Q.   Do you know if they are also -- do
you know if they are also examining for state
laws?
6    A.   I don't know.  But since we do not
7 provide the state exceptions, I don't believe
8 that that is in the approval process.
9    Q.   What do you mean by provide the
10 state exceptions?
11    A.   That's a separate table of
12 information.  They review the base shell of
13 the document, and I believe it is primarily
14 for FDCPA compliance.  In fact, FTCR, federal.
15 They're not looking at all of the individual
16 state exceptions.  It's do you put the
17 California language, do you --
18    Q.   Okay.
19    A.   To my knowledge now.
20    Q.   Do you know, do you personally
21 know, what the law is regulating debt
22 collectors in California?
23    MR. SCHULTZ:  Object to the form of

**58**

1 the question.  It is a bit over broad.  I
2 think that it's very broadly asked.
3    THE WITNESS:  I would consider
4 myself to be knowledgeable enough about the
5 specific laws in the State of California as it
6 relates to running our operations.   And what
7 I mean by that is, if we were physically
8 located in the State of California and had a
9 physical presence, we could have additional
10 regulation that does not apply to us in
11 Illinois.   So I feel like I'm proficient from
12 the perspective of what I need to be
13 proficient in to run our business as it
14 resides in Illinois.
15 BY MR. BLYTHIN:
16    Q.   Okay.  What specific thing do you
17 know about California law, just name one thing
18 that you know specifically about California
19 law that affects how AFNI does business.
20    A.   The credit bureau verbiage that we
21 have to add to the notices.
22    Q.   How about New York?
23    A.   The New York City permit number.

**59**

1    Q.   How about New Mexico?
2    A.   New Mexico, exemptions where we
3 would not be able to collect on any New Mexico
4 account if they were originated in the State
5 of New Mexico or there was an in-state client,
6 because it's a brick and mortar state.
7    Q.   How about Wisconsin?
8    A.   Wisconsin.  Wisconsin does not have
9 a licensing requirement for us, because we do
10 not have any in-state clients.  If we had an
11 in-state client that was physically in
12 Wisconsin, then we would have a licensing
13 requirement.
14    Q.   Is that the extent of your
15 knowledge about Wisconsin collection law?
16    A.   No.
17    Q.   What else do you know about --
18 specifically about Wisconsin collection law as
19 applies to AFNI?
20    A.   As it applies to AFNI?  That
21 there's really nothing that unique about the
22 State of Wisconsin any more so than almost
23 every other state out there.  It's an agency

**60**

1 friendly state.  It doesn't have any real
2 arduous requirements that go much beyond --
3 it's very consistent with the rest of the
4 states.  And I -- you know, almost all states
5 have laws on the books about harassment, time
6 of day dialing, but that's the same -- you're
7 really looking for what's outside of the norm.
8    Q.   Are you familiar with the Wisconsin
9 Consumer Act?
10    A.   Vaguely.
11    Q.   What specifically is your knowledge
12 about the consumer act?
13    A.   Most of my knowledge about the
14 consumer act has become one more of late as it
15 relates to this case.
16    Q.   What was your knowledge about the
17 consumer act prior to your -- around the time
18 the letters were sent out, the letters to the
19 plaintiffs in this case?
20    A.   Beyond what was identified in the
21 ACA documentation --
22    Q.   Why don't we mark this.
23    A.   -- that we provided?

61

1    (Deposition Exhibit 6 was marked for
2  identification purposes.)
3    BY MR. BLYTHIN:
4    Q.   This is Exhibit 6.  Can you
5  identify what this is?
6    A.   This is -- American Collectors
7  Association publishes a collection guidelines
8  document, and they have a state by state
9  analysis of individual state laws and more so
10  identifying exceptions to the norm that as an
11  agency operating in a national environment
12  would need to be aware of in order to comply.
13    Q.   Okay.  So you are familiar --
14  before we get into the details of this -- you
15  are familiar generally that the Wisconsin
16  Consumer Act includes a section specifically
17  aimed at debt collection, correct?
18    A.   Correct.
19    Q.   Are you aware of any other section
20  of the consumer act that would apply to debt
21  -- that could apply to debt collection
22  activity even though it's not a section that
23  specifically addresses debt collection?

62

1    A.   If it was not identified at the ACA
2  level within the documentation, then no.
3    Q.   This document, Exhibit 6, entitled
4  the, I guess, state laws governing adding of
5  interest fees or collection cost.  The bottom
6  paragraph here says the laws of the remaining
7  nine states and a bunch of states including
8  Wisconsin provide specific circumstances
9  regarding fee -- interest and fees and stuff.
10  Where in this document would it spell out
11  those instances?
12    A.   Move into the specific Wisconsin
13  section, it is on page 12.  It's identified as
14  page 12.
15    Q.   Page 12 of the Wisconsin section?
16    A.   Yes, which is -- this is the
17  standard format for all of the states.  And so
18  they have -- see the section towards the
19  bottom, can agencies add interest or fees.
20    Q.   You'll have to bear with me a
21  little bit with this document because this is
22  the first I've seen of it.
23    A.   I should have brought you the whole

63

1  thing.  It's this thick (indicating).
2    MR. BLYTHIN:  Off the record.
3    (An off the record discussion was held.)
4    BY MR. BLYTHIN:
5    Q.   So on page 12 where it says can
6  agencies add interest fees?
7    A.   Right.
8    Q.   Is this the section that would
9  address whether an agency can add collection
10  fees to accounts?
11    A.   Yeah, this -- it's a standard kind
12  of boilerplate of topics of concern for the
13  agencies for every state, and then if there is
14  something that we need to be concerned about,
15  they populate it, the section.
16    Q.   Without going into the details of
17  other states --
18    A.   So my interpretation would be that
19  because this is all that's here, the rest of
20  the statutes are silent with relationship to
21  anything else.  So then we would yield to
22  federal, which would be the provision for the
23  addition of the fee and the contract relating

64

1  to that.
2    Q.   But this doesn't say anything -- it
3  doesn't specifically say that they can add
4  collection fees?
5    A.   Right.  Which would say -- which
6  from our -- so our interpretation would be
7  that Wisconsin statute is silent.  They don't
8  provide for it, but they don't prohibit it.
9    Q.   But did anybody at AFNI look at the
10  Wisconsin statute?
11    A.   No.
12    Q.   They just relied solely on this
13  document that says nothing about collection --
14  adding collection fees in Wisconsin?
15    A.   Correct.  Well, you're not relying
16  solely on this document.  You're relying on
17  the fact that there's nothing anywhere, and
18  it's a general business practice that's going
19  on and is going on everywhere.  So there's no
20  reason for you to believe that it's -- that
21  there is anything there, you know what I'm
22  saying?  So I would start digging for what?
23  And as you can see by the front cover, the

65

1   bulk of the states are silent, they say
2   nothing.  So it's not uncommon for a state to
3   say nothing about it, not provide for it or
4   prohibit.
5       Q.   But the last paragraph on here says
6   that Wisconsin has specific circumstances?
7       A.   And that's the specific
8   circumstance that's identified, and that's
9   what I read.  There's the circumstance.  I
10  had no reason to believe there were any other
11  circumstances beyond the circumstance that was
12  identified.
13      Q.   How many Wisconsin accounts does --
14  strike that.
15          Approximately how many Cingular
16  accounts in Wisconsin does AFNI have -- did
17  AFNI have at the time that the letters went
18  out to Seeger and the rest of the plaintiffs?
19      A.   South of 10,000.  It's a very
20  small listing segment.
21      Q.   If -- looking back at Exhibit 3,
22  Exhibit A.
23      A.   The first notice?

66

1       Q.   Right.  If Mr. Seeger had paid, you
2   know, $20, would that be added to -- or,
3   sorry, would that have been subtracted from
4   the collection fee, the original balance, or
5   does it not matter because they just put them
6   both together?
7       A.   No, it does matter.  There's a
8   specific posting order of which you have to
9   adhere to and it's principal first.  Fee is
10  always the last thing applied, if there's
11  anything that can be applied.
12      Q.   Can AFNI figure out how much was
13  collected -- how much of that was collected
14  was attributed to the collection fees?
15      A.   Yes.
16      Q.   Without naming any specific
17  companies or anything, does AFNI collect on
18  other companies' accounts in Wisconsin and add
19  collection fees?
20      A.   No.
21      Q.   Just Cingular then?
22      A.   Yes.  Outside of a possibility of
23  a customer who originated in a separate state

67

1   that could have moved to Wisconsin, which
2   would be a handful at best.
3          MR. BLYTHIN:  Off the record.
4   (An off the record discussion was held.)
5   BY MR. BLYTHIN:
6       Q.   Just a few final questions.  Did
7   you -- are you aware of the organization or
8   state agency in Wisconsin that is responsible
9   for either supervising collectors -- or strike
10  that.
11          Is the Wisconsin state agency
12  called the Department of Financial
13  Institutions?
14      A.   Yes.
15      Q.   Do you have any dealings with them?
16      A.   I don't personally, no.
17      Q.   Well, does AFNI?
18      A.   I don't know.  I would assume that
19  we have some type of registration requirements
20  that we have to deal with them.
21      Q.   They're typically referred to as
22  DFI.
23      A.   Registered agents for corporations.

68

1       Q.   Did anybody at AFNI contact DFI
2   regarding whether collection fees are
3   permitted prior to this lawsuit?
4       A.   No.  Not to my knowledge, no.
5       Q.   Did anybody contact -- at AFNI
6   contact DFI to find out whether Wisconsin's --
7   the Wisconsin Consumer Act applied to credit
8   card debts -- I'm sorry, not credit card
9   debts, cell phone debts prior to this lawsuit?
10      A.   If that is the -- did we provide
11  that document?
12          MR. SCHULTZ:  Yes.
13          THE WITNESS:  Is that the
14  department she's in?
15          MR. SCHULTZ:  I don't recall.
16          THE WITNESS:  If that's the
17  department that Kathleen's in.  It's that
18  response from Kathleen.  I don't know who she
19  is.
20          MR. BLYTHIN:  I'm familiar with
21  that document.  Once we find it, we'll mark
22  it.
23          THE WITNESS:  I just don't remember

69

1 **exactly. She's in the regulatory organization**
2 **for agencies. Consumer affairs I believe is**
3 **her department, yes.**
4 **BY MR. BLYTHIN:**
5 Q. Well, the question --
6 A. **Department of Financial**
7 **Institutions, yes, we did contact them.**
8 Q. Prior to the lawsuit?
9 A. **No.**
10 Q. Was it -- why don't we mark this
11 document.
12 (Deposition Exhibit No. 7 was marked for
13 identification purposes.)
14 BY MR. BLYTHIN:
15 Q. Was this -- do you know -- can you
16 identify this document first? It's marked as
17 Exhibit 7.
18 A. **Yes, this was a request that went**
19 **to the Department of Financial Institutions to**
20 **try and gain some understanding of what their**
21 **interpretation of Wisconsin fee laws would be.**
22 **And this would be Kathleen Hanna, who's the**
23 **compliance officer for the Office of Consumer**

70

1 **Affairs response.**
2 Q. This was sent in September 2005?
3 A. **That is the return date, yes.**
4 Q. Do you know if this was sent in
5 response to the lawsuit, because I believe the
6 lawsuit was filed before this date?
7 A. **I don't know of the origination of**
8 **this per se.**
9 Q. But the question is, did anybody
10 contact DFI prior to the date the lawsuit was
11 filed, which I believe was in July of 2005?
12 A. **Did we contact them prior to the**
13 **lawsuit?**
14 Q. Right.
15 A. **No, we would have no reason to**
16 **contact them prior to the lawsuit outside of**
17 **general course of business that I already**
18 **explained.**
19 Q. Did you ever contact a Wisconsin
20 attorney or an attorney licensed in Wisconsin
21 regarding compliance with the Wisconsin
22 Consumer Act specifically?
23 A. **Prior to?**

71

1 Q. Prior to the lawsuit.
2 A. **No, not prior to the lawsuit. Not**
3 to my knowledge, no.
4 Q. You did afterwards?
5 A. **Yes.**
6 Q. Is that Mr. Schultz' firm?
7 A. **Yes.**
8 Q. Did anybody at your -- at AFNI do
9 any legal research as to whether collection
10 fees are permitted in Wisconsin on these cell
11 phone accounts prior to the lawsuit?
12 A. **Yes.**
13 Q. Who?
14 A. **Me, and the rest of our compliance**
15 **staff when we originally went through the**
16 **process in 2002.**
17 Q. Was the compliance staff the same
18 group of people that you had previously --
19 A. **No, they would have been involved**
20 **post. Myself and Jeff Shephard would have**
21 **been the primary ones involved in 2002.**
22 Q. Did you look at the consumer act --
23 Wisconsin Consumer Act at that point?

72

1 A. **In 2002?**
2 Q. Yes.
3 A. **No.**
4 Q. Have you personally ever read
5 section 422 of the Wisconsin statutes, Chapter
6 422 of the Wisconsin statutes?
7 A. **Without seeing it, I could not say.**
8 **I don't memorize statutes.**
9 Q. Perhaps I should get it out.
10 Chapters 422 through 427 are the Wisconsin
11 Consumer Act.
12 A. **In its entirety?**
13 Q. Yes.
14 A. **Definitely not. Excerpts.**
15 Q. Do you know if anybody at AFNI on
16 the compliance staff, other than you, would
17 have reviewed that prior to this lawsuit?
18 A. **I would have no recollection of**
19 **anyone reviewing that.**
20 Q. Did you ever ask an attorney prior
21 to the lawsuit to assist you with compliance
22 specifically with the Wisconsin Consumer Act?
23 A. **No.**

73

1    Q.   So other than -- strike that.

2         So your -- it's your -- was your

3    understanding of whether collection fees are

4    permitted on this type of accounts in the

5    State of Wisconsin limited to the absence of

6    information on it in that ACA manual prior to

7    the lawsuit?

8    A.   **That document as well as any other**

9    **published bulletins that would have come to my**

10   **attention.**

11   Q.   Do you remember specifically any of

12   those?

13   A.   **There's periodic notification of**

14   **e-mails on a daily basis from the Debt Buyers**

15   **Association, from the credit and collection**

16   **industry associations, you know, late breaking**

17   **news.  So there was never anything that came**

18   **to my attention otherwise.  But the primary**

19   **basis for our understanding of Wisconsin and**

20   **its associated statutes would have been based**

21   **on the ACA documentation.**

22        MR. BLYTHIN:  Okay.  I have

23   **nothing further.**

74

1         MR. SCHULTZ:  I want to clarify

2    **something.**

3    **EXAMINATION BY MR. SCHULTZ:**

4    Q.   About three or four minutes ago you

5    were asked if you had read the Wisconsin Act,

6    and my recollection is you said you hadn't

7    read it in its entirety.

8    A.   **Right.**

9    Q.   And then you commented excerpts.

10   A.   **Yes.**

11   Q.   Is it your testimony you've read

12   excerpts of it?

13   A.   **Yes.**

14        MR. SCHULTZ:  That's it.

15        **FURTHER DEPONENT SAYETH NOT;**

16        BY AGREEMENT SIGNATURE RESERVED.

17

18

19

20

21

22

23

75

1    STATE OF ILLINOIS   )

2                        ) SS

3    COUNTY OF PEORIA     )

4         C E R T I F I C A T E

5    I, Cindy M. Scribner, CSR-RPR, License

6    #084-004465, a Notary Public duly commissioned

7    and qualified in and for the County of Peoria

8    and State of Illinois, DO HEREBY CERTIFY that,

9    pursuant to notice, there came before me on

10   the 25th day of July, A.D., 2006, at the

11   Interstate Center, Bloomington, Illinois, the

12   following named person, to wit:

13        JIM HESS,

14   called by the plaintiffs who was by me first

15   duly sworn to testify to the truth and nothing

16   but the truth of his knowledge touching and

17   concerning the matters in controversy in this

18   cause and that he was thereupon carefully

19   examined upon his oath, and his examination

20   immediately reduced to shorthand by means of

21   stenotype by me.

22   I ALSO CERTIFY that the deposition is a true

23   record of the testimony given by the witness,

76

1    that the reading and signing of the deposition

2    by the said witness were expressly reserved,

3    and that the necessity of calling the court

4    reporter at time of trial for the purpose of

5    authenticating said transcript was waived.

6    I FURTHER CERTIFY that I am neither attorney

7    or counsel for, nor related to or employed by,

8    any of the parties to the action in which this

9    deposition is taken, and, further, that I am

10   not a relative or employee of any attorney or

11   counsel employed by the parties hereto, or

12   financially interested in the action.

13   IN WITNESS WHEREOF, I have hereunto set my

14   hand at Peoria, Illinois, this 15th day of

15   August, A.D., 2006.

16                    *Cindy M. Scribner*

17                    CSR-RPR

18

19

20

21

22

23

77

1   STATE OF ILLINOIS       )
2                           )
3   COUNTY OF PEORIA        )
4

    I, Jim Hess, do hereby certify that I have
6   read the foregoing transcript, consisting of
7   pages numbered 1 through 78 inclusive, and
8   that the same is true and correct, except as
9   may be noted on the attached sheet(s).
10   Dated at Bloomington, Illinois this _____
11  day of _____, 2006.
12
13
14
15  _____
16
17
18
19
20
21
22
23

78

### STATEMENT OF CORRECTION

2   Page and Line Number:_____
3   Reason:_____
4   Page and Line Number:_____
5   Reason:_____
6   Page and Line Number:_____
7   Reason:_____
8   Page and Line Number:_____
9   Reason:_____
10  Page and Line Number:_____
11  Reason:_____
12  Page and Line Number:_____
13  Reason:_____
14  Page and Line Number:_____
15  Reason:_____
16  Page and Line Number:_____
17  Reason:_____
18  Page and Line Number:_____
19  Reason:_____
20  Page and Line Number:_____
21  Reason:_____
22  Page and Line Number:_____
23  Reason:_____

1

**#**

#084-004465 - 1:14, 75:6

**$**

$20 - 66:2

**'**

'89 - 21:17
'93 - 23:3
'94 - 23:22, 24:5

**0**

007445744-02 - 35:21
05-c-714 - 1:8

**1**

1 - 8:8, 11:14, 11:19, 77:7
1-7 - 3:11
10 - 15:11
10,000 - 65:19
12 - 22:10, 62:13, 62:14, 62:15, 63:5
15 - 21:3, 36:9, 37:9, 37:11, 37:15, 37:18, 38:3
1587 - 36:8
15918 - 4:9
15th - 76:14
1952 - 44:12
1965 - 20:11
1988 - 21:14
1989 - 22:1
1991 - 20:23, 21:14, 22:19
1993 - 23:2, 23:6
1994 - 24:2
1997 - 48:13, 48:17

**2**

2 - 26:11, 26:15, 26:17, 29:1, 30:22, 32:21, 55:22
2002 - 71:16, 71:21, 72:1
2004 - 27:22
2005 - 70:2, 70:11
2006 - 1:19, 75:10, 76:15, 77:11
222 - 2:6
25th - 1:18, 75:10

**3**

3 - 34:7, 34:11, 35:3, 36:21, 44:19, 48:3, 65:21
300 - 2:6
30b6 - 8:3
312 - 2:7
3620 - 2:2
3:00 - 1:19

**4**

4 - 3:7, 54:22, 55:3
40 - 33:6
40,000 - 28:13
400 - 55:11
414 - 2:3
422 - 72:5, 72:6, 72:10
427 - 72:10
45 - 14:18
482-8000 - 2:3
4th - 20:23, 22:19

**5**

5 - 54:22, 55:3
50,000 - 28:14, 33:6
5044 - 37:8
53110 - 2:3

**6**

6 - 61:1, 61:4, 62:3
60601 - 2:6
61704 - 4:10

**7**

7 - 69:12, 69:17
704-3000 - 2:7
74 - 3:8
78 - 77:7

**8**

8 - 11:19

**9**

9-27-04 - 35:19
90 - 35:12

**A**

ability - 12:20
able - 11:22, 12:2, 31:18, 59:3
abreast - 46:3, 46:14
absence - 73:5
Aca- 17:13, 20:18, 46:6, 49:6, 56:18, 60:21, 62:1, 73:6, 73:21
account - 16:14, 19:18, 26:20, 26:21, 27:9, 27:13, 27:15, 29:5, 29:7, 29:10, 32:15, 35:9, 35:20, 35:22, 37:4, 41:18, 42:7, 43:13, 55:5, 59:4
accountable - 54:17
accounts - 14:5, 28:1, 28:3, 28:14, 28:16, 32:15, 33:1, 40:10, 40:23, 41:2, 41:7, 41:23, 42:8, 42:15, 42:22, 43:3, 43:7, 43:23, 63:10, 65:13, 65:16, 66:18, 71:11, 73:4
accused - 7:15
acquisition - 42:6
Act- 60:9, 61:16, 68:7, 70:22, 71:23, 72:11, 72:22, 74:5
act- 60:12, 60:14, 60:17, 61:20, 71:22
action - 13:22, 76:8, 76:12
activities - 10:6
activity - 29:14, 54:6, 61:22
Ad- 1:19, 75:10, 76:15
add - 31:36:19, 37:11, 37:17, 58:21, 62:19, 63:6, 63:9, 64:3, 66:18
added - 34:17, 34:22, 34:23, 38:9, 66:2
adding - 31:17, 49:23, 62:4, 64:14
addition - 12:12, 32:11, 39:16, 53:5, 63:23
additional - 34:17, 58:9
address - 4:8, 29:8, 35:19, 45:10, 50:3, 53:5, 53:6, 63:9
addresses - 53:14, 61:23
adds - 36:17
Ademi- 2:2, 4:12
adhere - 66:9
affairs - 69:2
Affairs- 70:1
affect - 12:20
affects - 58:19
Afni - 1:9, 4:16, 7:1, 8:4, 8:21, 8:22, 9:1, 9:18, 10:1, 15:7, 15:10, 20:22, 21:7, 21:8, 22:18, 27:12, 27:17, 28:17, 29:7, 30:18, 31:13, 35:20, 36:7, 36:16, 36:17, 38:12, 38:14, 39:7, 39:13, 39:15, 41:1, 41:6, 41:17, 42:14, 44:3, 44:17, 52:20, 53:21, 54:12, 56:5, 56:10, 58:19, 59:19, 59:20, 64:9, 65:16, 65:17, 66:12, 66:17, 67:17, 68:1, 68:5, 71:8, 72:15
Afni's - 18:4, 35:7
afterwards - 71:4
agencies - 44:13, 62:19, 63:6, 63:13, 69:2
agency - 20:19, 25:2, 25:3, 25:23, 59:23, 61:11, 63:9, 67:8, 67:11
agents - 67:23
ago - 14:1, 27:17, 74:4
Agreement - 74:16
agreement - 28:15, 32:8, 32:9, 32:10, 32:17, 38:15, 39:3, 39:4
agreements - 32:6
ahead - 39:20, 39:22, 40:1
aimed - 61:17
Alabama - 9:7, 33:8
Alaska - 33:8
allowable - 31:15
allowed - 37:16, 43:19
almost - 59:22, 60:4
amended - 34:22
American - 61:6
amount - 31:8, 36:8, 36:17, 37:13, 53:12
analysis - 61:9
analysts - 54:5
Anderson - 14:23, 18:14, 19:1, 19:21, 6:5, 6:16, 40:11
answered - 5:21
answers - 5:5, 5:17, 8:5
Appearances - 2:1
applied - 66:10, 66:11, 68:7
applies - 59:19, 59:20
apply - 58:10, 61:20, 61:21
approval - 49:7, 57:8
arduous - 60:2
area - 43:17
areas - 44:3, 44:8, 44:16
Arizona - 9:6
Arkansas - 23:8, 23:10
As400- 55:9, 55:11
assist - 72:21
assisted - 20:2
associated - 73:20
Association- 46:9, 61:7, 73:15
associations - 73:16
assume - 6:17, 9:21, 23:4, 31:22, 34:16, 36:4, 67:18
assuming - 26:2, 38:5
assure - 53:22
attached - 3:12, 48:3, 77:8
attempt - 44:4, 53:7
attempting - 43:23, 53:23
attention - 73:10, 73:18
attest - 48:20
attorney - 4:12, 13:14, 14:12, 46:1, 47:8, 47:21, 70:20, 72:20, 76:6, 76:10
attorneys - 32:12
attributed - 66:14
audible - 5:17
August- 76:15
authenticating - 76:5
authorizes - 32:11
automatically - 39:5, 45:14
Avenue - 2:2
avoid - 40:5
aware - 13:17, 13:23, 14:2, 19:12, 19:14, 20:1, 43:3, 43:17, 44:2, 49:12, 61:12, 61:19, 67:7

**B**

Ba - 20:15, 20:16
backbone - 53:11
background - 20:6, 34:23, 40:16
balance - 29:8, 29:14, 29:15, 36:3, 36:10, 37:9, 37:12, 38:10, 49:22, 66:4
Banko - 53:10, 53:12
bankruptcies - 41:10
bankruptcy - 41:19, 41:21, 41:23, 42:6, 42:53:12
Bar - 46:9
base - 50:7, 51:4, 57:12
based - 13:22, 27:20, 73:20
basis - 52:4, 52:8, 54:6, 56:13, 57:2, 73:14, 73:19
bear - 62:20
became - 24:11, 24:16
become - 60:14
beginning - 5:10
behalf - 8:4, 27:14
belong - 22:15
best - 41:12, 41:15, 49:15, 54:8, 67:2
between - 24:12, 28:13, 38:15
Beyond - 60:20
beyond - 39:20, 39:23, 40:9, 40:10, 50:6, 50:9, 60:2, 65:11
big - 42:16, 45:8, 50:13
Big- 42:18
biggest - 15:19
Bill- 22:21
bill - 22:22, 22:23, 56:2
binding - 40:4
bit - 8:15, 58:1, 62:21
Blarek - 1:6
block - 29:22
Bloomington - 1:17, 4:10, 9:2, 10:4, 11:4, 21:10, 21:11, 22:3, 24:10, 26:9, 75:11, 77:10
Bloomington/ normal - 23:23, 33:23
Blythin - 2:4, 3:7, 4:4, 4:11, 6:10, 8:10, 11:9, 11:12, 11:13, 12:16, 12:18, 13:2, 13:4, 13:12, 18:11, 18:18, 18:22, 26:13, 28:20, 28:22, 28:23, 34:9, 34:14, 36:11, 36:13, 36:14, 39:22, 39:23, 40:15, 40:22, 41:14, 54:20, 55:1, 58:15, 61:3, 63:2, 63:4, 67:3, 67:5, 68:20, 69:4, 69:14, 73:22
bodies - 46:5, 46:6
boilerplate - 63:12
books - 44:12, 60:5
born - 20:8
bottom - 36:4, 62:5, 62:19
Boulevard - 11:2
Bradley - 1:4, 37:3, 55:5
Branch - 23:7, 23:13, 24:14
branch - 23:10, 23:19, 24:3, 24:7, 24:13, 25:17, 26:5
branches - 25:18
break - 5:11, 5:14
breaking - 73:16
brick - 59:6
Briefly - 16:16
broad - 58:1
broadly - 58:2

Advantage Reporting Service

| | | | | |
|---|---|---|---|---|
| **brought** - 12:6, 12:15, 16:8, 17:13, 23:22, 62:23<br>**Bs** - 20:15<br>**Buffalo** - 45:7<br>**built** - 24:1<br>**bulk** - 43:14, 65:1<br>**bulletins** - 46:7, 73:9<br>**bunch** - 62:7<br>**bundles** - 32:23, 42:17<br>**bureau** - 58:20<br>**business** - 8:19, 22:9, 23:23, 24:18, 24:21, 25:1, 25:3, 26:9, 39:1, 40:14, 58:13, 58:19, 64:18, 70:17<br>**buy** - 28:13, 39:13<br>**Buyers** - 73:14<br>**buying** - 39:16, 44:13 | 27:10, 27:13, 28:1, 28:3, 28:13, 28:15, 28:17, 29:3, 29:6, 29:10, 29:20, 31:7, 32:1, 32:2, 32:23, 33:7, 35:22, 36:18, 38:12, 38:14, 38:16, 39:15, 40:10, 40:23, 41:4, 42:1, 42:16, 42:22, 43:3, 43:6, 43:12, 43:22, 44:5, 52:20, 56:2, 65:15, 66:21<br>**Cingular's** - 32:10<br>**circumstance** - 65:8, 65:9, 65:11<br>**circumstances** - 62:8, 65:6, 65:11<br>**Ciskey** - 46:20, 46:21, 46:23, 47:1, 47:7<br>**City** - 1:17, 45:7, 58:23<br>**civil** - 7:10<br>**Civil** - 8:2<br>**clarify** - 33:5, 42:5, 43:5, 55:17, 74:1<br>**class** - 29:21<br>**clause** - 32:13<br>**client** - 24:18, 59:5, 59:11<br>**clients** - 59:10<br>**close** - 24:5<br>**clubs** - 22:16<br>**cluster** - 33:22<br>**code** - 29:13, 30:11<br>**codes** - 51:5<br>**collect** - 32:15, 38:18, 43:19, 43:23, 44:4, 44:5, 53:23, 59:3, 66:17<br>**collected** - 66:13<br>**collectible** - 54:9<br>**collecting** - 27:14<br>**collection** - 10:5, 10:6, 11:7, 15:17, 15:22, 20:19, 24:15, 24:16, 24:23, 25:2, 25:22, 26:8, 30:12, 30:17, 31:8, 31:11, 31:15, 31:23, 32:11, 36:3, 36:8, 36:17, 37:8, 37:14, 38:9, 44:12, 44:18, 44:19, 46:17, 49:23, 50:1, 59:15, 59:18, 61:7, 61:17, 61:21, 61:23, 62:5, 63:9, 64:4, 64:13, 64:14, 66:4, 66:14, 66:19, 68:2, 71:9, 73:3, 73:15<br>**collections** - 7:5, 10:10, 10:21, 30:13, 54:13<br>**collector** - 22:21, 22:22, 22:23<br>**Collectors** - 61:6<br>**collectors** - 57:22, 67:9<br>**college** - 21:21<br>**Colorado** - 45:5<br>**coming** - 14:2, 29:23, 31:23<br>**commencing** - 1:19<br>**commented** - 74:9<br>**commissioned** - 75:6<br>**committee** - 46:2, 46:15, 54:14<br>**compani** | 39:12, 66:17<br>**companies'** - 66:18<br>**company** - 21:3, 21:9, 23:18, 24:1, 25:13, 40:4, 50:3<br>**company's** - 40:4<br>**compilation** - 53:17<br>**complaint** - 13:16, 13:17, 14:5, 14:6, 14:10, 34:17, 34:20, 34:22<br>**completed** - 52:1<br>**completely** - 15:16<br>**compliance** - 46:2, 46:15, 54:1, 54:14, 54:19, 57:1, 57:14, 69:23, 70:21, 71:14, 71:17, 72:16, 72:21<br>**comply** - 44:20, 61:12<br>**complying** - 54:12<br>**computer** - 16:18, 30:5, 45:12, 50:21, 50:23<br>**Computer** - 45:13<br>**concern** - 63:12<br>**concerned** - 13:3, 63:14<br>**concerning** - 75:17<br>**confer** - 6:3<br>**confident** - 18:8<br>**confirm** - 36:16<br>**Connecticut** - 44:9<br>**consider** - 58:3<br>**consistent** - 60:3<br>**consisting** - 77:6<br>**consolidated** - 23:21<br>**consumer** - 60:12, 60:14, 60:17, 61:20, 71:22<br>**Consumer** - 60:9, 61:16, 68:7, 69:2, 69:23, 70:22, 71:23, 72:11, 72:22<br>**contact** - 68:1, 68:5, 68:6, 69:7, 70:10, 70:12, 70:16, 70:19<br>**content** - 13:9<br>**continually** - 45:19<br>**contract** - 17:19, 17:23, 28:12, 29:11, 31:15, 31:16, 31:20, 32:1, 32:2, 32:3, 38:13, 38:15, 63:23<br>**contracts** - 32:4<br>**controversy** - 75:17<br>**conversations** - 13:9<br>**copies** - 35:18<br>**corner** - 35:18<br>**corporate** - 9:22, 46:11, 46:12<br>**Corporate** - 9:23<br>**corporation** - 8:4<br>**corporations** - 67:23<br>**Correct** - 16:11, 26:10, 37:10, 41:5, 61:18, 64:15<br>**correct** - 11:17, 13:14, 28:2, 32:1, 33:4, 36:20, 38:6, 41:2, 41:18, 42:23, 61:17, 77:8<br>**Correction** - 78:1<br>**cost** - 62:5<br>**counsel** - 4:20, 4:22, 8:14, 20:2, | 45:21, 45:23, 46:11, 46:12, 49:5, 49:10, 76:7, 76:11<br>**country** - 32:18, 42:22, 43:15, 44:3, 46:6<br>**County** - 1:15, 1:17, 75:3, 75:7, 77:3<br>**couple** - 14:5, 48:11<br>**course** - 13:21, 56:10, 70:17<br>**Court** - 1:1<br>**court** - 4:15, 5:2, 5:5, 5:18, 6:13, 7:10, 53:18, 76:3<br>**courts** - 46:5<br>**cover** - 64:23<br>**coverage** - 49:8<br>**create** - 48:17<br>**created** - 48:16<br>**creating** - 52:8<br>**credit** - 10:4, 10:6, 11:6, 29:21, 46:17, 58:20, 68:7, 68:8, 73:15<br>**creditor** - 26:23, 27:8, 27:10, 35:22, 49:22<br>**criminal** - 7:13<br>**cross** - 34:5<br>**Csr** - 1:14, 75:5, 76:17<br>**Csr-rpr** - 1:14, 75:5, 76:17<br>**Cudahy** - 2:3, 4:13<br>**Culbertson** - 2:5<br>**current** - 25:10, 31:4, 41:6, 41:7<br>**Curt** - 47:14<br>**Customer** - 32:6<br>**customer** - 10:13, 10:19, 32:7, 32:9, 32:10, 32:19, 35:8, 38:16, 43:8, 56:4, 56:11, 66:23<br>**customer's** - 43:12<br>**customers** - 33:1, 33:7, 33:8 | 68:8, 68:9<br>**deceased** - 53:4<br>**defective** - 42:12<br>**Defendant** - 1.10<br>**defendant** - 2:3<br>**Definitely** - 72:14<br>**degree** - 47:12<br>**delinquency** - 29:21<br>**delivered** - 27:3<br>**department** - 47:19, 68:14, 68:17, 69:3<br>**Department** - 67:12, 69:6, 69:19<br>**Deponent** - 74:15<br>**deposed** - 6:19<br>**deposes** - 4:2<br>**deposition** - 5:10, 8:2, 11:15, 12:8, 13:6, 14:2, 14:13, 16:23, 17:12, 19:2, 19:5, 19:9, 19:10, 19:22, 75:22, 76:1, 76:9<br>**Deposition** - 1:11, 8:18, 11:14, 26:11, 54:22, 61:1, 69:12<br>**depositions** - 5:9, 7:1, 13:3<br>**details** - 49:18, 49:20, 61:14, 63:16<br>**determine** - 13:21, 52:21<br>**Detroit** - 51:22<br>**development** - 8:19, 47:4<br>**Dfl** - 67:22, 68:1, 68:6, 70:10<br>**dialing** - 60:6<br>**difference** - 24:12<br>**different** - 32:4, 33:2, 38:1, 43:9, 55:10, 55:18<br>**digging** - 64:22<br>**direct** - 40:11<br>**Director** - 8:19, 25:11, 47:3<br>**director** - 25:20<br>**directors** - 25:19, 25:22<br>**discharged** - 41:11<br>**discovery** - 14:10, 16:10, 18:3<br>**discuss** - 13:10<br>**discussion** - 6:7, 8:7, 11:11, 28:21, 34:13, 36:12, 40:21, 54:21, 63:3, 67:4<br>**disputes** - 15:23<br>**disregarding** - 27:4<br>**distribute** - 51:11<br>**district** - 22:5<br>**District** - 1:1, 1:2, 4:15, 22:3<br>**Diversified** - 51:21, 52:15<br>**Division** - 1:3<br>**divulge** - 13:8<br>**document** - 8:11, 11:16, 17:13, 18:16, 26:14, 34:10, 35:5, 35:11, 36:1, 36:22, 51:6, 57:13, 61:8, 62:3, 62:10, 62:21, 64:13, 64:16, 68:11, 68:21, 69:11, 69:16, 73:8<br>**documentation** - 20:3, 20:5, 60:21, 62:2, 73:21<br>**documents** - 12:6, 16:5, 16:12, 19:15, |

| | | |
|---|---|---|
| **C** | | |
| **cable** - 21:9<br>**calculated** - 37:13<br>**California** - 45:4, 57:17, 57:22, 58:5, 58:8, 58:17, 58:18<br>**cannot** - 27:2<br>**card** - 21:4, 68:8<br>**care** - 10:13, 10:19<br>**carefully** - 75:18<br>**Carolina** - 45:5<br>**carried** - 10:6<br>**carrier** - 32:17<br>**case** - 4:17, 18:10, 19:15, 19:16, 41:19, 41:20, 60:15, 60:19<br>**cases** - 7:3, 7:6, 13:20, 15:5, 15:7, 15:9, 15:12, 56:16<br>**caution** - 13:7<br>**caveat** - 12:11<br>**Cd** - 28:18, 30:4<br>**Cd-rom** - 28:18, 30:4<br>**celebrated** - 21:3<br>**cell** - 68:9, 71:10<br>**cellular** - 33:22<br>**center** - 10:5, 10:9, 10:18, 25:19, 25:21, 25:22<br>**Center** - 1:17, 75:11<br>**certain** - 43:15, 49:10<br>**certainly** - 18:15<br>**Certify** - 75:8, 75:22, 76:6<br>**certify** - 77:5<br>**change** - 35:1, 45:19, 50:17<br>**changed** - 48:11<br>**changes** - 34:16, 39:4, 45:22, 46:4, 46:10, 46:14<br>**Chapter** - 72:5<br>**Chapters** - 72:10<br>**charge** - 29:11, 32:14<br>**charge-off** - 29:11<br>**charges** - 31:18<br>**Charles** - 10:20<br>**check** - 56:16<br>**checklist** - 49:5<br>**Chicago** - 2:6, 34:3<br>**Cindy** - 1:13, 75:5<br>**Cingular** - 17:19, | | |

46:15, 54:14

4:22, 8:14, 20:2,

19:22, 26:15, 29:2,
52:9, 55:2
 done - 13:10
 doubt - 45:1
 down - 5:18, 48:20,
48:21, 52:7
 draft - 47:23
 drafted - 48:2,
48:12, 49:1, 49:2,
50:20
 Drive - 10:8, 11:3
 due - 29:14, 36:3
 duly - 4:2, 75:6,
75:15

**E**

 e-mails - 73:14
 early - 23:22
 East- 2:2
 Eastern - 1:2, 4:15
 education - 20:12
 eight - 11:22, 14:9,
22:9
 either - 19:22,
21:20, 41:10, 46:4,
67:9
 elements - 30:20,
50:7, 51:2, 52:5,
55:15
 Eli- 46:20
 employed - 76:7,
76:11
 employee - 76:10
 employees - 54:17
 employer - 8:20
 employment - 7:1
 encrypted - 28:18
 end - 50:19
 Entella - 30:13
 entirety - 72:12,
74:7
 entitled - 1:13, 62:3
 entries - 30:23
 environment -
61:11
 Esq - 2:4, 2:7
 essentially - 26:4,
32:22, 35:1, 42:11,
55:19
 established - 18:7
 estimate - 28:7
 evaluations - 56:23
 event - 32:13
 everywhere - 64:19
 exact - 27:19
 exactly - 55:15,
69:1
 Examination - 3:6,
4:4, 74:3
 examination - 57:2,
75:19
 examined - 75:19
 examining - 56:22,
57:4
 example - 34:3,
43:18
 except - 77:8
 exceptions - 57:7,
57:10, 57:16, 61:10
 Excerpts - 72:14
 excerpts - 74:9,
74:12
 execution - 24:15,
26:1
 exemptions - 59:2
 Exhibit - 8:8, 11:14,
26:11, 26:15, 26:16,
29:1, 30:22, 32:21,
34:7, 34:11, 35:2,

35:3, 36:21, 37:19,
37:22, 37:23, 38:1,
38:4, 38:5, 38:8,
44:19, 48:3, 55:22,
61:1, 61:4, 62:3,
65:21, 65:22, 69:12,
69:17
 Exhibits - 3:11,
44:19, 54:22, 55:2
 existing - 28:12,
43:10, 48:16
 experience - 28:6
 explain - 44:22
 explained - 70:18
 expressly - 76:2
 extent - 28:10,
59:14

**F**

 facilities - 9:13,
9:16, 9:18, 10:7,
10:14, 10:15
 facility - 10:3,
10:12, 10:13, 10:18,
10:21, 10:22, 11:1
 fact - 15:19, 19:8,
57:14, 64:17
 Fair- 52:16
 false - 50:9, 50:10
 familiar - 4:17,
34:10, 34:19, 60:8,
61:13, 61:15, 68:20
 familiarize - 14:4
 far - 13:2, 18:3,
22:13
 faxed - 55:7
 Fdcpa- 7:6, 15:12,
15:19, 56:23, 57:1,
57:14
 federal - 4:14,
57:14, 63:22
 Federal- 8:2
 Fee- 66:9
 fee - 31:8, 31:15,
31:23, 32:11, 36:3,
36:8, 36:17, 37:8,
37:14, 37:17, 38:9,
49:23, 50:1, 62:9,
63:23, 66:4, 69:21
 fees - 31:11, 31:17,
32:12, 38:17, 62:5,
62:9, 62:19, 63:6,
63:10, 64:4, 64:14,
66:14, 66:19, 68:2,
71:10, 73:3
 few - 12:14, 20:6,
67:6
 fields - 30:21, 51:14
 fifth - 10:12
 figure - 66:12
 filed - 13:16, 13:17,
70:6, 70:11
 files - 52:1, 53:9
 final - 56:2, 67:6
 finance - 47:13,
47:18
 Financial- 67:12,
69:6, 69:19
 financially - 76:12
 fine - 5:11
 firm - 4:12, 40:13,
46:13, 71:6
 first - 4:2, 7:7, 8:6,
9:17, 22:19, 26:16,
29:22, 31:3, 35:6,
35:7, 36:23, 39:7,
55:23, 62:20

66:9, 69:16, 75:14
 five - 23:16, 23:17,
24:4
 Five- 9:20
 five-month - 23:16
 flat - 52:6
 floor - 24:15, 26:1,
26:6
 flow - 28:12
 follow - 18:15
 following - 14:1,
75:12
 follows - 4:3
 foregoing - 77:6
 form - 29:18, 35:10,
48:13, 49:2, 51:12,
57:23
 format - 62:17
 forward - 28:12
 foundation - 18:7
 four - 26:16, 34:1,
55:23, 74:4
 franchise - 34:6
 friendly - 60:1
 front - 27:5, 27:20,
64:23
 Ftcr- 57:14
 Ftp- 52:7, 52:8,
52:11
 full - 52:9
 functions - 10:9
 Fundamentally-
25:6
 fundamentally -
25:9

**G**

 gain - 69:20
 Gamroth- 1:5, 37:3,
55:5
 Gary- 34:4
 gathering - 20:2,
20:4
 general - 38:23,
64:18, 70:17
 generally - 13:10,
13:13, 39:2, 50:1,
61:15
 generated - 36:4
 generic - 38:13,
38:15, 39:3
 generically - 54:12
 gentlemen - 47:13,
48:6
 geographic - 29:12,
33:17
 Geographic- 33:14
 geographically -
43:14
 given - 33:18, 75:23
 global - 24:19,
28:14
 goofy - 44:11
 governing - 62:4
 grade - 25:8
 graduate - 21:15
 group - 26:14, 33:5,
49:7, 71:18
 guess - 20:8, 31:21,
50:20, 62:4
 guidelines - 54:18,
61:7

**H**

 hand - 14:5, 26:17,
35:18, 76:14
 handful- 44:23

 Hanna - 69:22
 harassment - 60:5
 hard - 43:11
 head - 15:20, 45:1
 headquarters - 9:1,
9:22, 9:23
 hear - 6:3
 heart - 20:7
 held - 6:7, 8:7,
11:11, 28:21, 34:13,
36:12, 40:21, 54:21,
63:3, 67:4
 help - 20:4
 Hereby - 75:8
 hereby - 77:5
 hereto - 76:11
 hereunto - 76:13
 Hershey - 23:13,
24:3, 24:8
 Hess - 1:11, 4:1,
4:7, 75:13, 77:5
 high - 22:14
 higher - 25:8
 Hinshaw - 2:5
 historic - 21:2
 historically - 38:22
 hit - 42:10
 hold - 54:16
 home - 4:8
 hopefully - 54:10
 hours - 50:5
 house - 45:21,
52:10
 humor - 13:1, 13:3

**I**

 idea - 28:2
 identical - 55:21
 identification -
3:12, 8:9, 26:12, 34:7,
54:23, 61:2, 69:13
 identified - 29:19,
60:20, 62:1, 62:13,
65:8, 65:12
 identifies - 31:14
 identify - 4:22,
26:16, 35:5, 35:13,
35:16, 36:22, 55:3,
61:5, 69:16
 identifying - 61:10
 II - 2:6
 Illinois - 1:16, 1:18,
4:10, 9:2, 9:6, 9:14,
9:19, 10:11, 10:12,
20:9, 20:14, 21:15,
34:1, 58:11, 58:14,
75:1, 75:8, 75:11,
76:14, 77:1, 77:10
 immediately - 21:7,
21:23, 22:1, 75:20
 in-house - 45:21
 in-service - 29:10
 in-state - 59:5,
59:10, 59:11
 inbound - 10:19,
29:20
 Inc - 1:9, 8:21,
35:20
 include - 16:14,
31:11, 33:6, 33:7,
34:3, 38:9
 included - 55:23
 includes - 61:16
 including - 31:7,
43:18, 62:7
 inclusive - 77:7
 Indiana - 34:4
 indicate - 67:1,

 indicating - 63:1
 individual - 42:15,
57:15, 61:9
 individual's - 50:23
 industry - 10:11,
10:22, 20:20, 33:22,
73:16
 information - 13:8,
16:18, 29:5, 36:5,
37:5, 53:19, 55:20,
57:12, 73:6
 initial - 5:8, 44:18,
48:3
 insert - 45:10
 instances - 62:11
 institutions - 67:13,
69:7, 69:19
 insurance - 10:11,
10:22
 Int - 30:16
 intact - 50:14
 Intelec - 30:12,
30:14, 30:17, 51:9
 interactions - 13:22
 interest - 31:17,
62:5, 62:9, 62:19,
63:6
 interested - 76:12
 interpretation -
63:18, 64:6, 69:21
 interrogatory -
51:17
 Interstate - 1:16,
75:11
 Inverrary - 4:9
 investigate - 18:15
 involved - 18:9,
41:10, 47:12, 71:19,
71:21
 involving - 7:6
 Isaac - 52:16
 isolated - 43:15
 issue - 7:7, 40:18
 issues - 18:10,
54:13
 itemization - 49:23
 items - 8:6, 11:19
 itself - 24:16, 30:10,
32:1

**J**

 James- 4:7
 janitor - 22:6
 Jd- 2:4, 20:19
 Jeff- 48:8, 71:20
 Jersey- 33:8
 Jim- 1:11, 4:1,
75:13, 77:5
 Joanne- 1:5
 job - 8:18, 21:6,
21:20, 22:19, 25:6,
25:8
 jobs - 21:6, 21:18
 John- 4:11, 46:16
 joke - 13:1
 July- 1:19, 70:11,
75:10
 June- 20:23, 22:19

**K**

 Kathleen - 68:18,
69:22
 Kathleen's - 68:17
 keep - 45:22, 46:14
 Kentucky - 9:7
 kind - 7:3, 9:13,
14:1, 20:18, 21:5,
63:11

**King**- 10:3, 11:1, 11:3
**knowledgable** - 58:4
**knowledge** - 28:11, 40:3, 41:13, 41:15, 44:15, 54:8, 57:19, 59:15, 60:11, 60:13, 60:16, 68:4, 71:3, 75:16
**known** - 43:6

**L**

**Lane**- 4:10
**language** - 45:4, 45:5, 45:6, 45:7, 45:10, 55:12, 57:17
**large** - 42:18, 45:8
**Lasalle**- 2:6
**last** - 4:6, 31:3, 65:5, 66:10
**late** - 60:14, 73:16
**law** - 5:5, 15:14, 44:11, 54:13, 54:18, 57:21, 58:17, 58:19, 59:15, 59:18
**lawn** - 22:9
**laws** - 44:20, 45:19, 45:22, 57:5, 58:5, 60:5, 61:9, 62:4, 62:6, 69:21
**lawsuit** - 7:21, 7:22, 16:6, 56:6, 68:3, 68:9, 69:8, 70:5, 70:6, 70:10, 70:13, 70:16, 71:1, 71:2, 71:11, 72:17, 72:21, 73:7
**lawyer** - 5:9
**Layton**- 2:2
**Ld**- 29:22, 30:1
**lease** - 15:23
**least** - 24:4
**ledger** - 26:20
**left** - 35:18
**left-hand** - 35:18
**legal** - 71:9
**legally** - 31:18, 50:12, 54:9
**legislative** - 46:5
**less** - 48:22
**letter** - 35:7, 35:14, 35:17, 37:1, 37:6, 38:1, 44:19, 48:2, 48:4, 48:13, 48:16, 49:2, 49:6, 51:18, 52:1, 52:3
**letters** - 37:12, 49:9, 56:19, 56:22, 60:18, 65:17
**level** - 62:2
**Lexisnexis**- 53:11, 53:16
**License**- 1:14, 75:5
**licensed** - 70:20
**licensing** - 59:9, 59:12
**likely** - 16:22, 18:14, 33:7
**limited** - 73:5
**Line**- 78:2, 78:4, 78:6, 78:8, 78:10, 78:12, 78:14, 78:16, 78:18, 78:20, 78:22
**line** - 32:16, 40:2, 40:7, 49:17, 49:20
**lines** - 24:18, 24:21, 25:1, 34:6
**Lisa**- 14:23, 20:2, 46:16, 56:15

**list** - 11:22
**listed** - 37:13, 41:7, 41:17
**listing** - 65:20
**litigation** - 50:2
**load** - 27:20, 29:20, 30:2, 30:10, 42:8, 52:19
**loads** - 30:11
**local** - 44:20
**located** - 58:8
**locations** - 9:15
**look** - 16:3, 16:5, 16:12, 16:21, 17:2, 17:5, 17:9, 26:17, 32:21, 55:10, 55:18, 64:9, 71:22
**looked** - 17:3, 17:11, 19:21, 49:3
**Looking**- 11:14
**looking** - 30:15, 49:19, 57:15, 60:7, 65:21
**looks** - 55:12
**loud** - 6:2
**Luther**- 10:3, 10:23, 11:1, 11:3

**M**

**mail** - 52:9
**mailed** - 35:14
**mailing** - 45:10, 50:3
**mails** - 73:14
**main** - 50:5
**mainframe** - 55:14
**maintain** - 45:8, 52:2
**manage** - 24:14
**manager** - 23:7, 23:10, 23:13, 24:3, 24:11, 24:13, 24:14, 24:17, 25:5
**manager's** - 24:7
**managers** - 23:19, 25:12, 25:17, 26:3, 26:5
**managing** - 26:5, 26:8
**manual** - 73:6
**map** - 30:21
**mark** - 8:6, 60:22, 68:21, 69:10
**marked** - 3:11, 8:8, 26:11, 26:14, 34:7, 34:11, 54:22, 55:2, 61:1, 69:12, 69:16
**market** - 29:13, 33:22, 33:23
**Martin** - 10:3, 10:23, 11:1, 11:3
**Marvin** - 1:4, 26:22, 35:15, 55:4
**material** - 5:20
**matter** - 56:10, 56:12, 56:14, 66:15, 66:7
**matters** - 75:17
**Mcclain** - 1:5, 38:6
**Mclean** - 1:18
**mean** - 15:19, 54:16, 57:9, 58:7
**meaning** - 5:18, 13:8
**means** - 8:3, 30:2, 75:20
**meat** - 22:8
**medications** - 12:20
**meet** - 14:-

**meeting** - 13:19, 15:2
**meetings** - 15:4
**memoranda** - 50:1
**memorize** - 72:8
**memory** - 17:6
**mentally** - 14:7
**mentioned** - 10:23, 12:11, 15:1, 56:18
**merge** - 51:5
**merged** - 53:17
**met** - 13:14
**Mexico** - 59:1, 59:2, 59:3, 59:5
**might** - 18:21, 34:3, 40:18
**Milwaukee** - 1:3, 4:15
**mini** - 50:1
**minutes** - 14:18, 74:4
**misinterpret** - 40:8
**misleading** - 50:10
**Miss** - 18:14, 19:1, 19:21, 47:17
**missing** - 18:16, 18:17
**Missouri** - 9:7, 10:20
**modification** - 48:9
**modified** - 45:17, 45:18, 48:13, 48:15, 48:16, 49:2
**modifies** - 44:18
**monitor** - 54:6
**month** - 13:19, 23:16, 28:14, 28:19
**monthly** - 51:14, 66:16
**months** - 13:23, 23:11, 23:17, 24:4
**morning** - 8:14, 11:16
**morphed** - 25:7
**mortar** - 59:6
**Most** - 18:14, 31:4, 53:13, 56:16
**move** - 52:4, 52:7
**Move** - 62:12
**moved** - 43:9, 67:1
**moving** - 23:19, 50:19
**mowing** - 22:9
**Msa** - 33:20, 33:23, 34:3
**Msa's** - 33:18, 34:1
**multi** - 33:17
**multi-state** - 33:17
**multiple** - 33:18

**N**

**N's** - 46:20
**name** - 4:5, 4:6, 4:11, 30:14, 35:19, 50:3, 51:7, 58:17
**Name** - 29:8, 49:22
**named** - 75:12
**names** - 48:23
**naming** - 66:16
**national** - 61:11
**nature** - 19:9, 40:13
**necessarily** - 54:7
**necessity** - 76:3
**need** - 5:10, 5:13, 13:3, 14:3, 35:23, 58:12, 61:12, 63:14
**never** - 73:17
**New** - 33:8, 45:6

**59:2, 59:3, 59:5
new** - 15:20, 39:2, 39:3
**news** - 73:17
**newsletters** - 46:6
**nightly** - 52:4
**nine** - 62:7
**Nine** - 23:11
**noncollection** - 10:9
**noncollection-related** - 10:9
**norm** - 60:7, 61:10
**normal** - 23:18
**normally** - 28:8
**North** - 2:6, 45:5
**Notary** - 1:15, 75:6
**noted** - 77:9
**notes** - 16:14, 19:18, 26:20, 29:20, 30:2
**nothing** - 48:9, 59:21, 64:13, 64:17, 65:2, 65:3, 73:23, 75:15
**notice** - 11:15, 17:11, 35:6, 35:7, 36:23, 38:2, 48:4, 48:10, 50:13, 65:23, 75:9
**notices** - 58:21
**noticing** - 52:9
**notification** - 32:19, 73:13
**notifying** - 35:8
**Number** - 78:2, 78:4, 78:6, 78:8, 78:10, 78:12, 78:14, 78:16, 78:18, 78:20, 78:22
**number** - 28:9, 28:9, 29:10, 35:20, 35:21, 35:22, 35:23, 36:2, 38:21, 50:4, 53:7, 58:23
**numbered** - 77:7
**numbers** - 12:7, 53:15

**O**

**O'donnell** - 46:16, 47:7
**O'reilly** - 2:2, 4:12
**oath** - 5:1, 5:3, 5:4, 75:19
**Object** - 57:23
**object** - 18:6
**objection** - 40:2, 40:6
**obtain** - 44:4
**obviously** - 13:15, 17:11, 50:13
**Obviously** - 46:10
**occurred** - 41:23, 42:6
**occurring** - 46:4
**occurs** - 42:9
**Odonnell** - 46:19
**Office** - 69:23
**officer** - 69:23
**often** - 38:20
**once** - 13:19, 24:2, 28:19, 49:1
**Once**- 68:21
**one** - 7:6, 7:7, 11:10, 12:7, 15:20, 17:18, 17:19, 23:20, 25:23, 27:19, 30:18, 34:2,

**46:22, 47:11, 48:5
48:17, 50:13, 51:16, 51:21, 52:12, 53:13, 54:17, 58:17, 60:14
One**- 9:21, 25:16, 56:13
**ones** - 16:9, 24:22, 50:5, 55:6, 71:21
**operate** - 9:3, 9:6
**operating** - 54:17, 61:11
**operation** - 50:5
**operations** - 10:10, 10:19, 11:7, 23:22, 25:2, 26:6, 46:18, 58:6
**opposed** - 39:8
**order** - 30:23, 31:1, 31:2, 61:12, 66:8
**organization** - 47:14, 54:16, 67:7, 69:1
**organizations** - 22:16
**organized** - 33:11, 33:18
**original** - 13:16, 27:10, 34:17, 34:19, 36:2, 48:18, 49:22, 66:4
**originally** - 71:15
**originated** - 43:7, 59:4, 66:23
**origination** - 43:8, 70:7
**otherwise** - 16:19, 73:18
**out-of-service** - 29:11
**Outside** - 66:22
**outside** - 10:20, 13:22, 49:4, 49:10, 60:7, 70:16
**outsourced** - 10:8
**overnight** - 28:19
**oversight** - 54:15
**own** - 43:13
**owner** - 41:6, 41:7
**ownership** - 42:10
**owning** - 41:18
**Oyer** - 47:14, 47:16

**P**

**Page** - 3:7, 3:8, 62:15, 78:2, 78:4, 78:6, 78:8, 78:10, 78:12, 78:14, 78:16, 78:18, 78:20, 78:22
**page** - 27:20, 55:4, 62:13, 62:14, 63:5
**pages** - 12:14, 26:16, 27:3, 27:5, 50:1, 77:7
**paid** - 66:1
**paragraph** - 62:6, 65:5
**paralegal** - 13:18, 14:23, 15:1, 46:1
**part** - 49:6, 49:7
**particular** - 30:23, 31:1, 51:21
**parties** - 34:18, 76:8, 76:11
**party** - 7:20, 7:22, 24:23, 48:10
**past** - 29:14
**payment** - 29:14
**Pc** - 55:14
**peer** - 25:23

Advantage Reporting Service

5

penalty - 5:6
pending - 5:13, 13:20, 15:10
Pennsylvania - 23:14
People - 54:11
people - 50:15, 71:18
Peoria - 1:15, 10:11, 10:17, 20:9, 75:3, 75:7, 76:14, 77:3
per - 25:18, 56:13, 70:8
percent - 35:12, 36:9, 37:9, 37:11, 37:15, 37:18, 38:3
performance - 24:20
Perhaps - 72:9
periodic - 73:13
perjury - 5:6
permit - 58:23
permitted - 68:3, 71:10, 73:4
person - 18:8, 47:11, 53:20, 54:10, 75:12
personally - 7:21, 49:12, 57:20, 67:16, 72:4
perspective - 58:12
philosophically - 49:19
phone - 12:12, 29:8, 29:9, 50:4, 53:7, 53:15, 68:9, 71:11
physical - 9:10, 9:12, 58:9
physically - 58:7, 59:11
place - 11:7, 46:2, 54:2
plaintiff's - 7:19, 16:14
Plaintiffs - 1:7
plaintiffs - 1:12, 2:4, 19:14, 34:23, 60:19, 65:18, 75:14
plaintiffs' - 41:2
plant - 22:9
plugs - 50:23
Pm - 1:19
point - 54:8, 71:23
policy - 14:10
populate - 63:15
portfolio - 24:11, 24:13, 24:17, 24:20, 25:4, 25:12, 27:21, 28:1, 28:4, 28:8
portfolios - 42:18
Portfolios - 42:19
portion - 35:21
portions - 35:16
position - 8:17, 24:5, 24:7, 25:10, 47:2
positive - 12:14
possession - 18:4
possibility - 66:22
post - 20:12, 71:20
posting - 66:8
practice - 7:5, 38:23, 40:13, 56:14, 64:18
preceding - 21:7
predominantly - 53:13
prepare - 13:6, 14:13, 16:6, 19:1
prescrub - 42:8

presence - 9:10, 9:12, 58:9
president - 46:17
pressed - 43:11
prettier - 55:11
pretty - 21:2, 24:4
previous - 29:14
previously - 12:12, 19:16, 71:18
primarily - 53:3, 57:13
primary - 71:21, 73:18
principal - 36:9, 66:9
print - 5:23, 55:8, 55:9, 55:13
printed - 5:19, 16:18, 45:11
printing - 52:1, 55:14
printout - 55:11
prints - 26:19
privileged - 13:8
procedure - 14:10
Procedure - 8:3
procedures - 54:1
process - 14:8, 41:11, 50:20, 53:2, 56:19, 57:8, 71:16
processes - 14:10, 54:2
processing - 22:8
produced - 12:13, 12:15, 16:9, 16:13, 17:3, 18:5
product - 42:12
production - 18:9, 19:23
proficient - 58:11, 58:13
program - 30:7, 30:10, 30:21
prohibit - 31:17, 31:19, 64:8, 65:4
prohibited - 44:6
prohibits - 44:12
promoted - 23:4
provide - 57:7, 57:9, 62:8, 64:8, 65:3, 68:10
provided - 60:23
provision - 63:22
Public - 1:15, 75:6
public - 53:18
published - 73:9
publishes - 61:7
pulling - 52:13
purchase - 25:1, 27:12, 27:18, 28:15, 42:15, 43:5
purchased - 27:15, 27:22, 41:2, 41:4
purchases - 29:7
purchasing - 39:8
purpose - 76:4
purposes - 3:12, 8:9, 26:12, 34:8, 54:23, 61:2, 69:13
pursuant - 8:2, 75:9
put - 48:23, 52:6, 52:15, 57:16, 66:5
putting - 52:13, 52:14

**Q**

qualification - 49:8
qualified - 75:7
qualify - 49:12

questioning - 40:2
questions - 4:14, 14:9, 20:7, 67:6

**R**

raise - 40:18
range - 28:10
raw - 30:8
reached - 50:4
read - 5:2, 6:14, 8:13, 8:14, 11:16, 11:19, 35:23, 65:9, 72:4, 74:5, 74:7, 74:11, 77:6
Read- 14:5
readable - 30:9
reading - 29:16, 76:1
real - 54:10, 56:17, 60:1
really - 26:15, 35:1, 44:17, 54:15, 56:9, 59:21, 60:7
rearing - 15:20
reason - 43:18, 44:5, 64:20, 65:10, 70:15
Reason- 78:3, 78:5, 78:7, 78:9, 78:11, 78:13, 78:15, 78:17, 78:19, 78:21, 78:23
reasons - 34:6
receive - 13:20, 56:10
received - 56:5
Recognizing- 41:9
recollection - 14:11, 72:18, 74:6
record - 4:6, 6:7, 8:7, 11:9, 11:11, 12:23, 28:20, 28:21, 34:13, 36:11, 36:12, 40:19, 40:21, 53:18, 54:20, 54:21, 55:5, 63:2, 63:3, 67:3, 67:4, 75:23
records - 16:15, 19:16, 53:18
reduced - 75:20
referred - 67:21
referring - 32:4
reflect - 13:1
refresh - 17:6
regard - 29:1, 29:6
regarding - 12:5, 15:5, 62:9, 68:2, 70:21
regions - 33:14, 33:17, 43:6, 43:15
Registered- 67:23
registration - 67:19
regulating - 57:21
regulation - 58:10
regulatory - 46:5, 69:1
related - 8:5, 10:9, 14:9, 15:22, 76:7
relates - 58:6, 60:15
relating - 63:23
relationship - 24:19, 63:20
relative - 76:10
releases - 46:10
relied - 64:12
relying - 64:15, 64:16
remaining - 62:6
remember - 7:17

68:23, 73:11
rendering - 52:10
rephrase - 6:13, 44:1
reporter - 5:2, 5:18, 6:14, 76:4
represented - 4:19, 24:22
request - 56:13, 56:15, 69:18
requested - 18:3, 56:7
requests - 19:15, 19:23
requirement - 59:9, 59:13
requirements - 49:11, 49:13, 49:16, 60:2, 67:19
research - 71:9
Reserved- 74:16
reserved - 76:2
reside - 43:13
resides - 58:14
response - 68:18, 70:1, 70:5
responses - 51:16
responsibilities - 24:19
responsibility - 24:20, 25:8
responsible - 24:17, 26:1, 53:21, 54:11, 54:19, 67:8
responsive - 12:7
rest - 60:3, 63:19, 65:18, 71:14
return - 70:3
returning - 42:11
review - 13:18, 16:17, 17:18, 49:4, 57:12
reviewed - 17:10, 17:12, 38:23, 49:3, 50:21, 72:17
reviewing - 72:19
ridiculous - 50:18
Robert- 1:5
Rock- 23:7, 23:10
rom - 28:18, 30:4
Rpg- 30:11, 30:20
rpr - 1:14, 75:5, 76:17
Rule- 8:2
run - 31:2, 54:3, 58:13
running - 58:6

**S**

sale - 17:23, 18:2
sales - 17:19, 17:21
Sam- 4:7
Sayeth - 74:15
scheduled - 14:3
scholar - 20:18
School- 22:3
school - 22:4, 22:14
Schultz - 2:7, 3:8, 4:23, 6:8, 12:10, 12:23, 13:7, 14:20, 18:6, 18:13, 39:19, 39:22, 40:8, 40:20, 41:12, 57:23, 68:12, 68:15, 74:1, 74:3, 74:14
Schultz' - 46:13, 71:6
scope - 40:1

screen - 26:19, 30:9, 55:4
screens - 30:15
Scribner - 1:14, 76:5
scrub - 53:2, 53:4, 53:5, 53:12
se - 25:18, 70:8
search - 53:8
searching - 53:10
second - 11:10
secondary - 20:12
section - 26:20, 61:16, 61:19, 61:22, 62:13, 62:15, 62:18, 63:8, 63:15, 72:5
secure - 53:7
secured - 52:7
Security - 36:2
see - 12:8, 27:20, 31:4, 56:17, 62:18, 64:23
Seeger - 1:4, 4:16, 26:22, 35:15, 35:17, 37:6, 55:4, 65:18, 66:1
Seeger's - 27:8, 27:13
seeing - 27:19, 72:7
seem - 55:19
segment - 33:23, 65:20
segmentation - 33:14
sell - 42:7
semi - 30:8
send - 31:12, 31:13, 35:8, 38:12, 38:14, 39:2, 58:19
sends - 32:23
sent - 28:19, 29:3, 29:6, 37:2, 38:6, 43:4, 52:1, 60:18, 70:2, 70:4
sentences - 48:11
separate - 9:18, 57:11, 66:23
September - 27:22, 70:2
sequentially - 31:3
service - 29:10, 29:11, 32:6, 32:7, 32:9, 32:10, 32:16, 33:9, 38:15, 39:3, 39:4, 39:7, 39:15
servicing - 43:6
set - 76:13
settlement - 7:6
sheet(s - 77:9
shell - 57:12
Shephard - 48:8, 71:20
short - 8:22
shorthand - 75:20
show - 29:2
side - 7:19, 25:3, 26:9, 52:3
Signature- 74:16
signed - 49:9
signing - 76:1
silent - 63:20, 64:7, 65:1
similar - 10:15, 10:17
single - 43:11, 54:16
site - 52:7, 52:8, 52:11
sites - 26:3
Six - 39:14

Advantage Reporting Services

six - 23:17
size - 9:16
small - 65:20
Social - 36:2
social - 22:16
sold - 42:1
solely - 64:12, 64:16
sorry - 16:3, 19:12, 42:14, 47:23, 66:3, 68:8
sort - 14:4, 39:3
sources - 16:17
South - 65:19
speaking - 50:2
specific - 9:15, 24:22, 28:9, 29:12, 35:17, 37:4, 40:7, 40:17, 43:17, 44:3, 44:20, 45:2, 45:4, 45:5, 45:6, 52:20, 58:5, 58:16, 62:8, 62:12, 65:6, 65:7, 66:8, 66:16
specifically - 13:5, 16:13, 16:22, 17:6, 20:1, 36:18, 41:1, 44:17, 48:2, 54:13, 52:8, 58:18, 59:18, 60:11, 61:16, 61:23, 64:3, 70:22, 72:22, 73:11
Specifically - 33:5
specifics - 14:14
specify - 32:2, 38:16
speed - 16:22
Spell - 46:22
spell - 4:6, 17:21, 62:10
Ss - 75:2
St - 10:20
staff - 10:2, 20:4, 24:16, 54:5, 71:15, 71:17, 72:16
stamped - 31:5
stand - 30:1
standard - 32:12, 32:16, 62:17, 63:11
standing - 13:18, 40:1
start - 20:21, 39:19, 40:10, 64:22
started - 13:15, 22:2, 22:18, 48:12, 56:6
starting - 9:14, 22:1
State - 1:16, 1:18, 9:19, 10:12, 20:14, 21:16, 58:5, 58:8, 59:4, 59:22, 73:5, 75:1, 75:8, 77:1
state - 4:5, 15:14, 33:11, 33:16, 33:17, 34:6, 37:16, 43:10, 43:12, 43:17, 45:9, 45:22, 57:4, 57:7, 57:10, 57:16, 59:5, 59:6, 59:10, 59:11, 59:23, 60:1, 61:8, 61:9, 62:4, 63:13, 65:2, 66:23, 67:8, 67:11
Statement - 78:1
statements - 50:10, 55:23, 56:10, 56:11
states - 9:3, 9:5, 9:9, 9:11, 10:14, 33:2, 33:19, 43:2, 43:8, 44:16, 44:17, 45:19,

60:4, 62:7, 62:17, 63:17, 65:1
States - 1:1
statute - 64:7, 64:10
statutes - 63:20, 72:5, 72:6, 72:8, 73:20
stay - 46:3
stenotype - 75:21
step - 40:12, 56:16
steps - 52:21, 53:22
Sticking - 40:23
still - 41:6, 41:17
stint - 23:16
stop - 22:15
straight - 38:2
streamed - 30:3
streaming - 29:23
streams - 51:6
Street - 2:6, 11:2
strike - 16:4, 19:13, 21:19, 27:16, 32:22, 37:22, 38:13, 65:14, 67:9, 73:1
Strike - 47:23
stuff - 36:6, 45:15, 62:9
subject - 5:5
subrogation - 10:10, 10:21
subsequently - 43:9
subtracted - 66:3
suit - 4:14, 56:14
Suite - 2:6
supervising - 47:9
support - 20:4
surprised - 50:15
sweeping - 46:3
sworn - 4:2, 75:15
system - 30:5, 30:12, 30:14, 30:15, 30:17, 30:19, 50:22, 50:23, 51:8, 52:16, 55:9

**T**

table - 45:9, 45:11, 57:11
tables - 52:3
tag - 32:16
taxing - 34:6
Tci- 21:8, 22:2
template - 51:4, 52:2
ten - 25:21
Ten- 39:11
terminology - 33:21
terms - 10:2, 25:22, 45:23
territories - 33:10
testify - 11:23, 12:2, 12:21, 75:15
testifying - 8:4
testimony - 7:9, 7:12, 74:11, 75:23
Texas- 9:7
theirs - 52:14, 52:15
theoretically - 34:2
thereupon - 75:18
thick - 63:1
thinking - 14:8
third - 24:23, 48:10
third-party - 24:23, 48:10
threats - 50:2
three - 74:4
title - 25:8
today - 14:1

together - 33:4, 66:6
took - 5:1
top - 44:23
topics - 11:22, 16:23, 35:2, 63:12
touching - 75:16
towards - 62:18
track - 45:22
training - 47:3
transcript - 3:13, 5:19, 76:5, 77:6
translate - 5:23, 30:8
translation - 45:9, 52:3
transmitted - 28:16
Transunion- 53:17
trial - 7:10, 7:13, 76:4
tries - 46:13
true - 75:22, 77:8
truth - 75:15, 75:16
try - 69:20
Try- 15:6, 50:17
trying - 31:21, 46:3, 53:6
turn - 35:2, 37:19
Turn- 36:21
Twice- 6:22
two - 10:7, 12:5, 12:7, 22:23, 23:1, 55:2, 55:10
Two- 46:20
type - 37:5, 40:14, 67:19, 73:4
typically - 13:19, 20:3, 28:13, 29:6, 67:21
Typically- 34:5

**U**

ugly - 15:20
uncommon - 65:2
understood - 6:17, 14:6
unique - 29:9, 59:21
United - 1:1
University - 20:14, 21:16
unrelated - 15:16, 15:18
unusual - 40:12
up - 14:3, 16:22, 18:15, 24:2, 36:7
updates - 13:20
updating - 53:14
upgrade - 53:6
upload - 30:4, 51:11, 53:2
Upper - 36:18
uses - 30:18

**V**

Vaguely - 60:10
valid - 52:22, 53:23
validate - 54:7
Validation - 50:13
validation - 56:16
variable - 51:2, 51:5, 52:5, 52:6
vendor - 51:18
verbiage - 58:20
version - 48:19
versus - 4:16
via - 28:19
vice - 46:17

**W**

waived - 76:5
watered - 48:20
ways - 55:10
Whereof - 76:13
whole - 29:22, 62:23
Wi- 2:3
wife - 19:8, 19:11
Wiley - 10:7
Wireless- 27:11
Wisconsin - 1:2, 4:13, 4:16, 59:7, 59:8, 59:12, 59:15, 59:18, 59:22, 60:8, 61:15, 62:8, 62:12, 62:15, 64:7, 64:10, 64:14, 65:6, 65:13, 65:16, 66:18, 67:1, 67:8, 67:11, 68:7, 69:21, 70:19, 70:20, 70:21, 71:10, 71:23, 72:5, 72:6, 72:10, 72:22, 73:5, 73:19, 74:5
Wisconsin's - 68:6
wit - 75:12
witness - 1:12, 75:23, 76:2
Witness - 18:20, 58:3, 68:13, 68:16, 68:23, 76:13
works - 40:5
worry - 40:18
written - 19:23, 30:11

**Y**

year - 20:10, 21:4, 48:22
years - 21:3, 21:12, 22:10, 23:1
yield - 63:21
York - 45:6, 58:22, 58:23

Advantage Reporting Service

# APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOUKE HALE,<br>on behalf of plaintiff and a class, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 08 CV 3918 |
| | ) | |
| vs. | ) | Judge Coar |
| | ) | Magistrate Judge Schenkier |
| AFNI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by 28 U.S.C. §1746, that the following statements are true:

1.      Edelman, Combs, Latturner & Goodwin, LLC, has 5 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, and Michelle R. Teggelaar and 9 associates.

2.      **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School.  From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases).  In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982.  From the end of 1985 he has been in private practice in downtown Chicago.  Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions.  He is the author of Chapter 6, "Predatory Lending and Potential Class Actions," in Real Estate Litigation (Ill. Inst. For Cont. Legal Educ. 2008), Chapter 4-1, "Truth in Lending Act," in Illinois Causes of Action (Ill. Inst. For Cont. Legal Educ. 2008), ch. 6 of Illinois Mortgage Foreclosure Practice (Ill. Inst. For Cont. Legal Educ.2003); Predatory Lending and Potential Class Actions, ch. 5 of Real Estate Litigation (Ill. Inst. For Cont. Legal Educ.2004); co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Payday Loans:  Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection:  The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995);

author of <u>An Overview of The Fair Debt Collection Practices Act</u>, in Financial Services Litigation, Practicing Law Institute (1999); co-author of <u>Residential Mortgage Litigation</u>, in Financial Services Litigation, Practicing Law Institute (1996); author of <u>Automobile Leasing: Problems and Solutions</u>, 7 Loy.Consumer L.Rptr. 14 (1994); author of <u>Current Trends in Residential Mortgage Litigation</u>, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); author of <u>Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Consumers</u>, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of <u>Illinois Consumer Law</u> (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, <u>Attorney Liability Under the Fair Debt Collection Practices Act</u> (Chicago Bar Ass'n 1996); author of <u>The Fair Debt Collection Practices Act: Recent Developments</u>, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994). He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Court for the District of Arizona, United States District Court for the District of Connecticut, and the Supreme Court of Illinois. He is a member of the Northern District of Illinois trial bar.

      **3.**    **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School. She formerly supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law. She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991. Decisions in which she was involved prior to joining the firm include: <u>Johnson v. Heckler</u>, 607 F.Supp. 875 (N.D.Ill. 1984), and 100 F.R.D. 70 (N.D. Ill. 1983); <u>Sanders v. Shephard</u>, 185 Ill.App.3d 719, 541 N.E.2d 1150 (1st Dist. 1989); <u>Maller v. Cohen</u>, 176 Ill.App.3d 987, 531 N.E.2d 1029 (1st Dist. 1988); <u>Wright v. Department of Labor</u>, 166 Ill.App.3d 438, 519 N.E.2d 1054 (1st Dist. 1988); <u>Barron v. Ward</u>, 165 Ill.App.3d 653, 517 N.E.2d 591 (1st Dist. 1987); <u>City of Chicago v. Leviton</u>, 137 Ill.App.3d 126, 484 N.E.2d 438 (1st Dist. 1985); <u>Jude v. Morrissey</u>, 117 Ill.App.3d 782, 454 N.E.2d 24 (1st Dist. 1983). She is a member of the Northern District of Illinois trial bar.

      **4.**    **James O. Latturner** is a 1962 graduate of the University of Chicago Law School. Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma. From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions. His publications include Chapter 8 ("Defendants") in <u>Federal Practice Manual for Legal Services Attorneys</u> (M. Masinter, Ed., National Legal Aid and Defender Association 1989); <u>Governmental Tort Immunity in Illinois</u>, 55 Ill.B.J. 29 (1966); <u>Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations</u>, 2 Loy.Consumer L.Rep. 64

(1990), and Illinois Consumer Law (Chicago Bar Ass'n 1996). He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience. He has argued some 30 appeals, including two cases in the United States Supreme Court and two in the Illinois Supreme Court. Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers. He is a member of the Northern District of Illinois trial bar.

5.     **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991). She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.** Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000); Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803 (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL); Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996). She is a member of the Northern District of Illinois trial bar.

6.     **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997). **Reported Cases:** Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL

3

299803 (N.D. Ill. 1998).

      7.    **Associates**

      **a.**      **Francis R. Greene** is a graduate of Johns Hopkins University (B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** Johnson v. Thomas, 342 Ill. App.3d 382, 794 N.E.2d 919 (1st Dist. 2003); Jolly v. Shapiro & Kreisman, 237 F. Supp. 2d 888 (N.D. Ill. 2002); Parker v. 1-800 Bar None, a Financial Corp., Inc. 2002 WL 215530 (N.D. Ill. 2002); Jiang v. Allstate Ins. Co. (199 F.R.D. 267); Hill v. AMOCO Oil Co. 2003 WL 262424, 2001 WL 293628 (N.D. Ill. 2003); Roquet v. Arthur Anderson LLP 2002 WL 1900768 (N.D. Ill. 2002); White v. Financial Credit, Corp. 2001 WL 1665386 (N.D. Ill.); Ransom v. Gurnee Volkswagen 2001 WL 1241297 (N.D. Ill. 2001) and 2002 WL 449703 (N.D. Ill 2002); Doxie v. Impac Funding Corp. 2002 WL 31045387 (N.D. Ill. 2002); Levin v. Kluever & Platt LLC 2003 WL 22757763 and 2003 WL 22757764 (N.D. Ill. 2003); Pleasant v. Risk Management Alternatives 2003 WL 22175390 (N.D. Ill. 2003); Jenkins v. Mercantile Mortgage 231 F. Supp. 2d 737 (N.D. Ill. 2002); Hobson v. Lincoln Ins. Agency, Inc. 2001 WL 55528, 2001 WL 648958 (N.D. Ill. 2001), Anderson v. Lincoln Ins. Agency 2003 WL 291928, Hobson v. Lincoln Ins. Agency 2003 WL 338161 (N.D. Ill. 2003); Handy v. Anchor Mortgage Corp., 464 F.3d 760 (7th Cir. 2006). He is a member of the Northern District of Illinois trial bar.

      **b.**      **Julie Clark** (neé Cobolovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** Qualkenbush v. Harris Trust & Savings Bank 219 F. Supp.2d 935 (N.D. Ill.,2002); Covington-McIntosh v. Mount Glenwood Memory Gardens 2002 WL 31369747 (N.D.I ll.,2002), 2003 WL 22359626 (N.D. Ill. 2003); Ballard Nursing Center, Inc. v. GF Healthcare Products, Inc., 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007); Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co., No. 1-07-0684, 2007 Ill. App. LEXIS 1194 (Ill. App. 1st Dist. Nov. 13, 2007).

      **c.**      **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum laude,* 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** Clark v. Experian Info. Solutions, Inc., 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); DeFrancesco v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); Jeppesen v. New Century Mortgage Corp., 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); Benedia v. Super Fair Cellular, Inc., 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

      **d.**      **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:** Murray v. Sunrise Chevrolet, Inc., 441 F.Supp.2d 940 (N.D. Ill. 2006); Iosello v. Leiblys, Inc., 502 F. Supp.2d 782 (N.D. Ill. 2007); Claffey v. River Oaks Hyundai, Inc., 486 F. Supp.2d 776 (N.D. Ill. 2007).

  **e.** **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:** Pietras v. Sentry Ins. Co., 513 F. Supp.2d 983 (N.D. Ill. 2007); Hernandez v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); Balogun v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007).

  **f.** **Tiffany N. Hardy** (admitted NY, DC, IL) is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001).

  **g.** **Zachary Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

  **h.** **Rupali Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois College of Law (J.D. 2007).

  **i.** **Michael J. Aschenbrener** is a graduate of the University of Minnesota (B.A. 2001) and the Chicago-Kent College of Law, Illinois Institute of Technology (J.D. May 2007).

  **8.** The firm also has 15 legal assistants, as well as other support staff.

  **9.** Since its inception, the firm has recovered more than $500 million for consumers.

  **10.** The types of cases handled by the firm are illustrated by the following:

  **11.** **Mortgage charges and servicing practices:** The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices. These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation. Decisions in the firm's mortgage cases include: Christakos v. Intercounty Title Co., 196 F.R.D. 496 (N.D.Ill. 2000); Johnstone v. Bank of America, N.A., 173 F.Supp.2d 809 (N.D.Ill. 2001); Leon v. Washington Mut. Bank, F.A., 164 F.Supp.2d 1034 (N.D.Ill. 2001); Williamson v. Advanta Mortg. Corp., 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); McDonald v. Washington Mut. Bank, F.A., 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); Metmor Financial, Inc. v. Eighth Judicial District Court, No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); GMAC Mtge. Corp. v. Stapleton, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); Leff v. Olympic Fed. S. & L. Ass'n, 1986 WL 10636 (N.D.Ill. 1986); Aitken v. Fleet Mtge. Corp., 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); Poindexter v. National Mtge. Corp., 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); Sanders v. Lincoln Service Corp., 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. 1993); Robinson v. Empire of

America Realty Credit Corp., 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); In re Mortgage Escrow Deposit Litigation, M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); Greenberg v. Republic Federal S. & L. Ass'n, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

     **12.**     The recoveries in the escrow overcharge cases alone are over $250 million.  Leff was the seminal case on mortgage escrow overcharges.

     **13.**     The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

     **14.**     **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric.  Conley v. Sears, Roebuck, 1:97cv11149 (D.Mass); Fisher  v. Lechmere Inc., 1:97cv3065, (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  Bessette v. Avco Financial Services, 230 F.3d 439 (1st Cir. 2000).

     **15.**     **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

     **a.**     Hidden finance charges resulting from pass-on of discounts on auto purchases.  Walker v. Wallace Auto Sales, Inc., 155 F.3d 927, 1998 U.S. App. LEXIS 22663 (7th Cir. 1998).

     **b.**     Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 1998 U.S.App. LEXIS 16434 (7th Cir. 1998); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); Slawson v. Currie Motors Lincoln Mercury, Inc., 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); Cirone-Shadow v. Union Nissan, Inc., 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); Chandler v. Southwest Jeep-Eagle, Inc., 1995 U.S. Dist. LEXIS 8212 (N.D.Ill., June 8, 1995); Shields v. Lefta, Inc., 1995 U.S.Dist. LEXIS 7807 (N.D.Ill., June 5, 1995).

     **c.**     Spot delivery.  Janikowski v. Lynch Ford, Inc., 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); Diaz v. Westgate Lincoln Mercury, Inc., 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. 1994);  Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

     **d.**     Force placed insurance.  Bermudez v. First of America Bank Champion, N.A., 860 F.Supp. 580 (N.D.Ill. 1994); Travis v. Boulevard Bank, 1994 U.S.Dist.

LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); <u>Moore v.</u> <u>Fidelity Financial Services, Inc.</u>, 884 F. Supp. 288 (N.D.Ill. 1995).

        **e.**     Improper obligation of cosigners. <u>Lee v. Nationwide Cassell</u>, 174 Ill.2d 540, 675 N.E.2d 599 (1996); <u>Taylor v. Trans Acceptance Corp.</u>, 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995).

        **f.**     Evasion of FTC holder rule. <u>Brown v. LaSalle Northwest Nat'l</u> <u>Bank</u>, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

        **16.**     These cases also had a substantial effect on industry practices. The warranty cases, such as <u>Grimaldi</u>, <u>Gibson</u>, <u>Slawson</u>, <u>Cirone-Shadow</u>, <u>Chandler</u>, and <u>Shields</u>, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

        **17.**     **Predatory lending practices:** The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, mostly as class actions. <u>Livingston v. Fast Cash USA, Inc.</u>, 753 N.E.2d 572 (Ind. Sup. Ct. 2001); <u>Williams v. Chartwell</u> <u>Fin. Servs.</u>, 204 F.3d 748 (7th Cir. 2000); <u>Parker v. 1-800 Bar None, a Financial Corp., Inc.</u>, 01 C 4488, 2002 WL 215530 (N.D.Ill., Feb 12, 2002); <u>Gilkey v. Central Clearing Co.</u>, 202 F.R.D. 515 (E.D.Mich. 2001); <u>Van Jackson v. Check 'N Go of Ill., Inc.</u>, 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp. 2d 1085 (N.D.Ill. 2000); <u>Henry v. Cash Today, Inc.</u>, 199 F.R.D. 566 (S.D.Tex. 2000); <u>Donnelly v. Illini Cash Advance, Inc.</u>, 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); <u>Jones v. Kunin</u>, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); <u>Davis v. Cash for Payday</u>, 193 F.R.D. 518 (N.D.Ill. 2000); <u>Reese v. Hammer Fin.</u> <u>Corp.</u>, 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677 (N.D.Ill., Nov. 29, 1999); <u>Pinkett v. Moolah Loan Co.</u>, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); <u>Gutierrez v.</u> <u>Devon Fin. Servs.</u>, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); <u>Vance v. National</u> <u>Benefit Ass'n</u>, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

        **18.**     **Other consumer credit issues:** The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

        **a.**     Phony nonfiling insurance. <u>Edwards v. Your Credit Inc.</u>, 148 F.3d 427, 1998 U.S. App. LEXIS 16818 (5th Cir. 1998); <u>Adams v. Plaza Finance Co.</u>, 1999 U.S. App. LEXIS 1052 (7th Cir., January 27, 1999); <u>Johnson v. Aronson Furniture Co.</u>, 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

      **b.**     The McCarran Ferguson Act exemption. <u>Autry v. Northwest</u> <u>Premium Services, Inc.</u>, 144 F.3d 1037, 1998 U.S. App. LEXIS 9564 (7th Cir. 1998).

      **c.**     Loan flipping. <u>Emery v. American General</u>, 71 F.3d 1343 (7th Cir. 1995). <u>Emery</u> limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

      **d.**     Home improvement financing practices. <u>Fidelity Financial</u> <u>Services, Inc. v. Hicks</u>, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; <u>Heastie v. Community Bank of Greater Peoria</u>, 690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990). <u>Heastie</u> granted certification of a class of over 6,000 in a home improvement fraud case.

      **e.**     Arbitration clauses. <u>Wrightson v. ITT Financial Services</u>, 617 So.2d 334 (Fla. 1st DCA 1993).

      **f.**     Insurance packing. <u>Elliott v. ITT Corp.</u>, 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

      **19.**    **Automobile leases:** The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions. Decisions in these cases include <u>Lundquist v. Security Pacific Automotive Financial Services Corp.</u>, Civ. No. 5:91-754 (TGFD) (D.Conn.), <u>aff'd</u>, 993 F.2d 11 (2d Cir. 1993); <u>Kedziora v. Citicorp Nat'l</u> <u>Services, Inc.</u>, 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); <u>Johnson v. Steven Sims Subaru and Subaru Leasing</u>, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); <u>McCarthy v. PNC Credit</u> <u>Corp.</u>, 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); <u>Kinsella v. Midland Credit</u> <u>Mgmt., Inc.</u>, 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); <u>Highsmith v.</u> <u>Chrysler Credit Corp.</u>, 18 F.3d 434 (7th Cir. 1994); <u>Black v. Mitsubishi Motors Credit of</u> <u>America, Inc.</u>, 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); <u>Simon v. World Omni</u> <u>Leasing Inc.</u>, 146 F.R.D. 197 (S.D.Ala. 1992). Settlements in such cases include <u>Shepherd v.</u> <u>Volvo Finance North America, Inc.</u>, 1-93-CV-971 (N.D.Ga.)($8 million benefit); <u>McCarthy v.</u> <u>PNC Credit Corp.</u>, 291 CV 00854 PCD (D.Conn.); <u>Lynch Leasing Co. v. Moore</u>, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); <u>Blank v. Nissan</u> <u>Motor Acceptance Corp.</u>, 91 L 8516 (Circuit Court of Cook County, Illinois); <u>Mortimer v.</u> <u>Toyota Motor Credit Co.</u>, 91 L 18043 (Circuit Court of Cook County, Illinois); <u>Duffy v. Security</u> <u>Pacific Automotive Financial Services, Inc.</u>, 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

20.    Lundquist and Highsmith are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act. As a result of the Lundquist case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

21.    **Collection practices:** The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual. Decisions in these cases include: Jenkins v. Heintz, 25 F.3d 536 (7th Cir. 1994), aff'd 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); Johnson v. Revenue Management Corp., 169 F.3d 1057, 1999 U.S. App. LEXIS 3142 (7th Cir. 1999); Keele v. Wexler & Wexler, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589, 1998 U.S.App. LEXIS 15029 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338, 1997 U.S.App. LEXIS 5000 (7th Cir., Mar. 17, 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232, 1998 U.S.App. LEXIS 16112 (2d Cir. 1998); Young v. Citicorp Retail Services, Inc., 1998 U.S.App. LEXIS 20268 (2d Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 1997 U.S. App. LEXIS 16786 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995); Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Laws v. Cheslock, 1999 U.S. Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999);Davis v. Commercial Check Control, Inc., 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995). Settlements in such cases include Boddie v. Meyer, 93 C 2975 (N.D.Ill.); and Cramer v. First of America Bank Corporation, 93 C 3189 (N.D.Ill.).

22.    Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act. I argued it before the Supreme Court and Seventh Circuit. Avila v. Rubin is a leading decision on phony "attorney letters."

23.    **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions. One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA. Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006); Murray v.

9

GMAC Mortgage Corp., 05 C 1229, _____ F.Supp.2d _____, 2007 U.S. Dist. LEXIS 26726 (N.D.Ill. April 10, 2007); Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007 U.S. Dist. LEXIS 27491 (N.D.Ind., April 12, 2007); In re Ocean Bank, 06 C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion, 2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill. 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006); Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19, 2006); Bonner v. Home 123 Corp., 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); Murray v. Sunrise Chevrolet , Inc., 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and Murray v. Finance America, LLC, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006). More than 15 such cases have been settled on a classwide basis.

24. **Class action procedure:** Important decisions include Crawford v. Equifax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000); Blair v. Equifax Check Services, Inc., 181 F.3d 832 (7th Cir. 1999); Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997); and Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

25. **Landlord-tenant:** The firm has brought a number of class actions against landlords for various matters including failing to pay interest on security deposits or commingling security deposits, breach of the warranty of habitability, improper late charges, and various violations of the CRLTO. Reported decisions include: Wang v. Williams,343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); Onni v. Apartment Management and Investment Co., 344 Ill. App. 3d 1099; 801 N.E.2d 586 (2d Dist. 2003) (case challenging improper late charges, which later settled on a class basis for $200,000); Dickson v. West Koke Mill Village P'Ship, 329 Ill.App.3d 341 (4th Dist. 2002). Illustrative cases include: Hale v. East Lake Management & Developmental Corp., et al., 00 CH 16139, in the Cook County Circuit Court, Judge Madden granted class certification for tenants who had not been paid their security deposit interest after the end of each twelve month rental period. The East Lake case later settled on a classwide basis for over $400,000.

26. Some of the other reported decisions in our cases include: Elder v. Coronet Ins. Co., 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); Smith v. Keycorp Mtge., Inc., 151 Bankr. 870 (N.D.Ill. 1992); Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); Armstrong v. Edelson, 718 F.Supp. 1372 (N.D.Ill. 1989); Newman v. 1st 1440 Investment, Inc., 1993 U.S.Dist. LEXIS 354 (N.D.Ill. 1993); Mountain States Tel. & Tel. Co. v. District Court, 778 P.2d 667 (Colo. 1989); Disher v. Fulgoni, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st Dist. 1984); Harman v. Lyphomed, Inc., 122 F.R.D. 522 (N.D.Ill. 1988); Haslam v. Lefta, Inc., 1992 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); Source One Mortgage Services Corp. v.

<u>Jones</u>, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

      27.     Gordon v. Boden is the first decision approving "fluid recovery" in an Illinois class action. <u>Elder v. Coronet Insurance</u> held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

                              <u>s/Daniel A. Edelman</u>
                              Daniel A. Edelman

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

11