IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOUKE HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  08 CV 3918 |
| v. | ) | |
| AFNI, INC., | ) | JUDGE DAVID H. COAR |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bouke Hale ("Plaintiff" or "Hale") filed this class action against Defendant AFNI, Inc. ("Defendant" or "AFNI") alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*. Plaintiffs' class was certified on October 23, 2009. Presently before the Court are the parties' cross-motions for summary judgment on the issue of liability under the FDCPA.  For the reasons stated below, Plaintiffs' motion is **GRANTED**, and Defendant's motion is **DENIED**.

I.  FACTUAL BACKGROUND

Hale claims that he first learned of the alleged debt central to this case in January of 2008, when a credit monitoring company listed a $267 debt to Verizon on his credit report. (Plaintiff's Rule 56.1 Statement of Material Facts ("PSOF") ¶ 9.)  When Hale obtained a full copy of his credit report, he discovered that AFNI was the company reporting the Verizon debt. (*Id.* ¶ 10.)  Although AFNI claims to have sent Hale an initial collection letter on November 10, 2007, Hale denies ever having received such a letter.  (Defendant's Rule 56.1 Statement of Material Facts ("DSOF") ¶ 42.)  Unable to recognize the debt listed on his credit report, Hale

sent AFNI a letter on March 28, 2008, requesting additional information about his alleged debt and stating, in relevant part:

> I just pulled a copy of my credit report and noticed that your agency is reporting that I owe you a debt. I was not aware of this debt until now, and under my rights under the FDCPA, I request that you validate this debt. Be advised that this is not a refusal to pay . . .
> . . .
> Please provide me with the following information:
>
> **What the money you say I owe is for;**
> **Explain and show me how you calculated what you say I owe;**
> **Provide me with copies of any papers that show I agreed to pay what you say I owe;**
> **Provide a verification or copy of any judgment if applicable;**
> **Identify the original creditor;**
> **Prove the Statute of Limitations has not expired on this account**
> **Show me that you are licensed to collect in my state**
> **Provide me with our license numbers and Registered Agent**
> . . .
> I would also like to request, in writing, that no telephone contact be made by your offices to my home or to my place of employment

(PSOF ¶¶ 11, 13 (emphasis in original).) In this letter, Hale accurately cited AFNI's account number for the Verizon debt and unambiguously identified the account he was disputing. (*Id.* ¶¶ 14-15). AFNI responded to Hale's letter on May 9, 2008 by sending a form letter that stated, in relevant part:

> We have received your dispute but we are unable to investigate at this time. You have provided insufficient information to substantiate your claim. We will complete our investigation within 30 days of receipt of the following information:
> - The specific information you dispute
> - An explanation of the basis of your dispute
> - All supporting documentation to substantiate your claim. Examples may include but is [sic] not limited to, photocopy of your driver's license, the identification page of your passport, proof of residency at time of service, receipts, etc.
> - A valid phone number to contact you
> . . .
> This communication is from a debt collector. Any information obtained will be used for that purpose. You have the right to inspect your credit.

(*Id.* ¶ 16.)  AFNI sent this letter to Hale automatically 25 days after AFNI received Hale's March 28, 2008 letter.  (*Id.* ¶ 17.)

On May 16, 2008, Hale wrote letters to three credit reporting agencies disputing the debt that AFNI reported.  (*Id.* ¶ 19.)  These reporting agencies, in turn, notified Hale that AFNI had verified his debt.  (*Id.* ¶ 20.)  Hale wrote to AFNI four more times—on May 12, June 4, and June 9, and June 11 of 2008—requesting that AFNI delete the Verizon debt from his credit reports.  (*Id.* ¶¶ 21, 24, 32.)  AFNI never responded to any of these requests.  (*Id.* ¶¶ 22, 25, 33.)

Hale filed complaints with the Better Business Bureau on May 15, 2008 and the Illinois Attorney General's office on June 20, 2008.  (*Id.* ¶ 23, 34.)  In response to Hale's complaint with the Better Business Bureau, on June 5, 2008 AFNI disclosed that: (a) the debt it reported as a Verizon account was actually a GTE account; (b) the account had been opened on August 6, 1999 at 1406 Chesterfield Drive in Carrollton, Texas; and (c) the account had been opened for three years.  (*Id.* ¶ 26.)  As a result of his complaint with the Illinois Attorney General, Hale also learned the telephone number associated with the alleged debt.  (*Id.* ¶ 35.)  (The Attorney General forwarded Hale's complaint to Verizon, and Verizon sent Hale a letter listing the phone number on the account at issue.  (*Id*. ¶¶ 34-35.)

Hale and his wife lived at 1406 Chesterfield Drive in Carrollton, Texas for one year from August 1998 to August 1999.  (*Id.* ¶ 36.)  When Hale and his wife moved from 1406 Chesterfield Drive in August 1999, they canceled their account for telephone service.  (*Id.* ¶ 38.)  The Verizon account associated with the debt AFNI reported was opened in August 1999, the same month that Hale and his wife moved and canceled their phone service.  (*Id.* ¶ 39.)  On July 3, 2009, after Hale filed his complaints with the Better Business Bureau and the Illinois Attorney General, and

this information came to light, AFNI finally requested that the credit reporting agencies delete the Verizon debt from Hale's credit reports.  (*Id.* ¶ 40.)

AFNI has sent the form letter Hale received in response to a wide range of consumer communications, including letters from:

(a) a writer offering partial payment and stating that the writer could not pay more because he or she was disabled and on state aid;

(b) an attorney stating that the debt at issue had been discharged in bankruptcy;

(c) persons stating that their respective debts had been discharged in bankruptcy;

(d) persons stating that the debtor was deceased;

(e) a writer stating that he or she was in prison and was prohibited by prison rules from paying the debt;

(f) a writer stating that he or she had been in prison during the time the debt had been incurred and who provided as proof his or her Illinois Department of Corrections identification number;

(g) a writer who attached a credit report and who stated that he or she had spoken to an AFNI representative that day who had (i) verified that the name and social security number on the account were different from those of the writer and (ii) requested that the writer send a credit report; and

(h) a writer claiming identity theft who attached twelve pages of documentation, including a five-page fraud affidavit, a police log indicating a report of identity theft, a copy of the writer's driver's license, and six pages of account statements and bills.

(*Id.* ¶ 18.)

Hale filed the instant lawsuit on July 10, 2008, claiming that AFNI's form letter violated the FDCPA.  On October 3, 2009, the Court certified a class of all individuals, with addresses in Illinois, Indiana, or Wisconsin, to whom AFNI sent a letter in the form represented by the letter Plaintiff received, on or after July 10, 2007, and on or before July 30, 2008.  Plaintiffs now move for summary judgment on the issue of liability, claiming that the statements in AFNI's letter that it was "unable to investigate" the individual's debt and that he or she had "provided insufficient

information to substantiate [the] claim" are false, deceptive, and misleading in violation of the FDCPA, 15 U.S.C. § 1692e. Plaintiffs contend that AFNI sent this false, non-responsive form letter to every consumer who wrote to AFNI without providing full payment; accordingly, this letter represents AFNI's effort to "stonewall" customers, causing them to simply give up and pay their alleged debt. AFNI disputes Plaintiffs' contentions and cross-moves for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a

genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

**III. ANALYSIS**

**a. "False, deceptive, or misleading" under § 1692e**

Congress enacted the FDCPA in order to curtail abusive debt collection practices. 15 U.S.C. § 1692(e). To that end, the FDCPA prohibits debt collectors from using any "false, deceptive, or misleading representation or means in connection with the collection of any debt." § 1692e. Section 1692e lists several types of proscribed conduct, including the two types Plaintiffs invoke in this case:

> **(2)** The false representation of—
> **(A)** the character, amount, or legal status of any debt;
>
> **(10)** The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

§§ 1692e(2)(A), (10).

The statements contained in AFNI's letter to Hale are undoubtedly false. AFNI's letter states, in relevant part, that it was "unable to investigate" Hale's claim because Hale provided "insufficient information to substantiate [his] claim." (PSOF ¶ 16.) AFNI's actions, however, belie these statements. That AFNI verified Hale's alleged debt to the credit agencies indicates that AFNI probably was able to investigate Hale's claim. (*Id.* ¶ 20.) Indeed, AFNI's response to Hale's Better Business Bureau complaint *confirms* that it was able to investigate Hale's claim. In response to Hale's complaint, AFNI informed the Better Business Bureau that the debt it reported as a Verizon account was actually a GTE account, that the account had been opened on August 6, 1999 at an address in Carrollton, Texas, and that the account had been opened for three years. (*Id.* ¶ 26.) Finally, at her deposition, AFNI's compliance manager, Lisa Anderson,

testified that AFNI began investigating Hale's dispute before it automatically sent him the letter at issue. (Anderson Dep. 23:15-24:2, June 9, 2009.)

AFNI sent the same letter it sent Hale to a variety of consumers who had already provided precisely the specific information, explanations, and supporting documentation requested by AFNI's letter. It is undisputed that AFNI sent the letter to:

(a) a writer stating that he or she had been in prison during the time the debt had been incurred and who provided as proof his or her Illinois Department of Corrections identification number;

(b) a writer who attached a credit report and who stated that he or she had spoken to an AFNI representative that day who had (i) verified that the name and social security number on the account were different from those of the writer and (ii) requested that the writer send a credit report;

(c) a writer claiming identity theft who attached twelve pages of documentation, including a five-page fraud affidavit, a police log indicating a report of identity theft, a copy of the writer's driver's license, and six pages of account statements and bills;

(d) a writer who attached a birth certificate and who stated that the account had been opened when he or she was a minor and without his or her knowledge or consent; and

(e) a writer who stated that he or she was a victim of identity theft and who enclosed ten pages of account statements and bills showing where the writer lived during the time the debt was incurred.

(*Id.* ¶ 18.) And the list continues. (*See id.* ¶ 18.) If AFNI was "unable to investigate" the claims involved in these cases, it is not clear what amount or type of information *would* have enabled AFNI to conduct an investigation. Moreover, AFNI provides no clear explanation for why the information provided by the consumers above—or Hale—was insufficient.

Although Hale effectively demonstrates that AFNI's letter contains false statements, Hale must do more to prevail. False statements, by themselves, do not violate the FDCPA. *See Wahl v. Midland Credit Mgmt.*, 556 F.3d 643, 646-47 (7th Cir. 2009). Hale must also establish that

these false statements (1) are confusing or misleading, and (2) that they are "material." As the Seventh Circuit held in *Wahl v. Midland Credit Mgmt.*:

> If a statement would not mislead the unsophisticated consumer, it does not violate the FDCPA-even if it is false in some technical sense. For purposes of § 1692e, then, a statement isn't "false" unless it would confuse the unsophisticated consumer.

556 F.3d at 646-47; *see also Ruth v. Triumph P'ships*, 577 F.3d 790, 800 (7th Cir. 2009) (citing *Wahl* for this proposition); *Muha v. Encore Receivable Mgmt. Inc.*, 558 F.3d 623, 627 (7th Cir. 2009) (same).

Accordingly, the Court must now consider whether Hale satisfied his burden of establishing that the false statements in AFNI's form letter are confusing or misleading within the meaning of § 1692e. When cases involve "plainly deceptive communications," courts may grant summary judgment in favor of the plaintiffs "without requiring them to prove what is already clear." *Ruth*, 577 F.3d at 801. However, when cases involve statements that are not plainly misleading but *might* mislead or deceive the "unsophisticated consumer," plaintiffs must present extrinsic evidence—normally consumer surveys—to prove that unsophisticated consumers find the statements at issue confusing or misleading. *Id.* at 800; *see also Muha*, 558 F.3d at 628.

Because Hale has not presented extrinsic evidence to demonstrate that the unsophisticated customer would be misled or deceived by the false statements in AFNI's letter, the Court must determine whether the statements are "plainly deceptive" such that summary judgment may be awarded to Plaintiffs on that basis. *See Ruth*, 577 F.3d at 801. The Court finds that they are. At the outset, AFNI's explanation of the statements in its letter not only fails to establish their veracity; it rings with insincerity. Indeed, this disingenuous explanation alerts the Court that AFNI's statements may not only be false but may be "plainly deceptive" as well.

After accepting this invitation to consider the nature of AFNI's false statements more closely, the Court concludes that they are, in fact, "plainly deceptive."

AFNI claims that it sends the form letter at issue only when a consumer disputes a debt outside the statutorily required 30-day validation period and fails to provide sufficient information to allow AFNI to conduct a meaningful investigation into the nature of the dispute. (DSOF ¶ 50.) In an effort to shed light on what additional information is needed to conduct a "meaningful investigation," AFNI explains that disputes generally fall into two categories: (1) disputes that the balance of the account is incorrect, and (2) disputes that the account does not belong to the debtor or something resembling a dispute. (*Id.* ¶ 50.) With respect to the first type of dispute, AFNI claims that it often needs additional information such as the dates of service on the account or dates that the debtor moved out of his or her home and canceled service. (*Id.* ¶ 51.) With respect to the second type of dispute, AFNI claims that it might need to know where the debtor lived at the time the debt was incurred or whether the account was the product of subscription fraud. (*Id.* ¶ 51.)

AFNI's explanation fails in several respects. As an initial matter, AFNI never explains why the information provided by Hale or the class members was insufficient. In addition, although it is frequently clear whether consumers fall into category (1) or category (2),[1] AFNI makes no effort to tailor its letter to reflect the additional information supposedly necessary for each category. Indeed, the form letter fails to request the information AFNI claims it needs for *either* category of dispute; nowhere in its letter does AFNI request the dates of service on the

---

[1] Of Plaintiff's list of sample class members' initial letters to AFNI, almost all can be easily assigned to category (1) or (2). (*See* PSOF ¶ 18(a)-(m).) For example, the writer claiming that he had been in prison during the time the debt had been incurred disputes the entire account and therefore belongs in category (2). (*Id.* at ¶ 18(f).) Other obvious members of category (2) include the writer claiming that an AFNI representative had verified that the name and social security number on his account were different from those of the writer, (*id.* at ¶ 18(f),) writers who claimed identity theft (*id.* at ¶¶ 18(h), (j), (k),) and the writer who stated that the account at issue had been opened when he or she was a minor and without his or her knowledge or consent (*id.* at ¶ 18(i)).

account, the dates that the debtor moved out of his or her home and canceled service, where the debtor lived at the time the debt was incurred, or whether the debtor believed the account was the product of subscription fraud. Moreover, it is certainly not evident that the general requests AFNI *does* include—requests for an explanation of the consumer's dispute and supporting documentation—would elicit the specific information AFNI claims it needs.

The insincerity of AFNI's explanation crystallizes with the revelation that AFNI sends its letter to consumers who have no disputes at all—e.g., a consumer who offered a partial payment and stated that he could not pay more because he was disabled and on state aid (*id.* ¶ 18(a)) and another who stated that he was in prison and was prohibited by prison rules from paying the debt (*id.* ¶ 18(e)). As these consumers do not dispute their debts, it makes no sense for AFNI to send them letters claiming to be "unable to investigate" their "disputes" and requesting more information. Finally, as discussed above, AFNI also sends its letter in response to consumers whose letters provided the exact information AFNI requests. The Court cannot but conclude that AFNI's explanation for the statements in its letter is disingenuous.

Left with no plausible explanation for AFNI's letter, the Court next considers the reaction of an unsophisticated consumer receiving this letter. *See Wahl*, 556 F.3d at 645 ("In deciding whether collection letters violate the FDCPA, we have consistently viewed them through the eyes of the 'unsophisticated consumer.'"). Such consideration leads us to conclude that AFNI's letter would confuse an unsophisticated consumer—or, for that matter, any consumer. AFNI's false statements that it was "unable to investigate" consumers' disputes because of "insufficient information" are deceptive in several senses. These statements may mislead consumers into believing that AFNI takes their disputes seriously and, accordingly, has considered the information they have already sent. AFNI's letter indicates that consumers who believe these

propositions are mistaken. In addition, the statements contained in AFNI's letter—which focus on how to effectively dispute the debt at issue—likely confuse consumers who have no dispute to lodge.[2]

Most seriously, AFNI's statements undeniably leave consumers (unsophisticated or otherwise) confused and uncertain as to how to vindicate their rights in the face of AFNI's letter. Many of the consumers who receive AFNI's letter have already provided all of the information they can muster—either because they *have* no information (like Hale) or because they have already offered the precise information, explanations, and supporting documentation requested by AFNI's letter.[3] It is completely unclear what a conscientious consumer is to do after receiving AFNI's letter. Consumers' confusion on this front is particularly problematic given the likelihood that many will conclude that the cost of pursuing their challenge outweighs the cost of simply forking over their money to pay the disputed debt. Reflecting exactly this concern, the Seventh Circuit recently observed that "[c]onfusing language in a dunning letter can have an intimidating effect by making the recipient feel that he is in over his head and had better pay up rather than question the demand for payment." *Muha*, 558 F.3d at 629. Moreover, "the inclusion of a confusing statement in a dunning letter can violate the Act by distracting the reader from the notice of his statutory rights, and . . . this is something that a judge in a particular case may be able to determine without evidence." *Id.* The Seventh Circuit's concerns apply with full force to this case.

---

[2] e.g., the consumer who offered a partial payment and stated that he could not pay more because he was disabled and on state aid (*id.* at ¶ 18(a)) and the consumer who stated that he was in prison and was prohibited by prison rules from paying the debt (*id.* at ¶ 18(e))

[3] e.g., the writer who attached a credit report, and who stated that he or she had spoken to an AFNI representative that day who had (i) verified that the name and social security number on the account were different from those of the writer and (ii) requested that the writer send a credit report (*id.* at ¶ 18(g)) and the writer who claimed identity theft who attached twelve pages of documentation, including a five-page fraud affidavit, a police log indicating a report of identity theft, a copy of the writer's driver's license, and six pages of account statements and bills (*id.* at ¶ 18(h))

AFNI makes much of the argument that its letter did not confuse Hale. Specifically, AFNI asserts that Hale understood his rights under the FDCPA and was trying to exercise them by sending AFNI a request for verification of his debt. (Def.'s Resp. to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ J. 10.) However, AFNI misses the point. Any relevant confusion occurred *after* Hale sent AFNI this request and received AFNI's gibberish form letter in response, and Hale testified that he was, in fact, confused at that point. During his deposition, Hale stated that he felt that AFNI's letter was an "incorrect" response to his request and that, instead of the letter he received, he had expected "some sort of verification, which is what I asked for in the first place." (Hale Dep. 34:23-35:24, May 29, 2009.) Hale then wrote to AFNI four more times requesting that AFNI delete the Verizon debt from his credit reports (PSOF ¶¶ 21, 24, 32), and each of these requests went unanswered (*id*. ¶¶ 22, 25, 33). Left with no recourse involving AFNI, Hale achieved a resolution only by filing complaints with the Better Business Bureau and Illinois Attorney General.

The Court notes that, despite AFNI's contrary argument, Hale *does* seem to have experienced the type of confusion AFNI's letter expectedly generates; Hale was surprised and confused by AFNI's letter, and as a result of AFNI's stonewalling, he was unable to vindicate his rights without enlisting help outside of AFNI. However, whether Hale was confused is not relevant to the Court's determination that AFNI's letter was "plainly deceptive" as a matter of law. The Court must consider the letter from the vantage point of the unsophisticated consumer—not necessarily Hale. *See Wahl*, 556 F.3d at 645-46. Although the Court need not decide the issue, Hale's effective, proactive approach to resolving his dispute through the Better Business Bureau and Illinois Attorney General indicates that he probably does not exemplify the unsophisticated consumer. Moreover, the Seventh Circuit has held that "[a]lthough the question

AFNI makes much of the argument that its letter did not confuse Hale. Specifically, AFNI asserts that Hale understood his rights under the FDCPA and was trying to exercise them by sending AFNI a request for verification of his debt. (Def.'s Resp. to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ J. 10.) However, AFNI misses the point. Any relevant confusion occurred *after* Hale sent AFNI this request and received AFNI's gibberish form letter in response, and Hale testified that he was, in fact, confused at that point. During his deposition, Hale stated that he felt that AFNI's letter was an "incorrect" response to his request and that, instead of the letter he received, he had expected "some sort of verification, which is what I asked for in the first place." (Hale Dep. 34:23-35:24, May 29, 2009.) Hale then wrote to AFNI four more times requesting that AFNI delete the Verizon debt from his credit reports (PSOF ¶¶ 21, 24, 32), and each of these requests went unanswered (*id*. ¶¶ 22, 25, 33). Left with no recourse involving AFNI, Hale achieved a resolution only by filing complaints with the Better Business Bureau and Illinois Attorney General.

The Court notes that, despite AFNI's contrary argument, Hale *does* seem to have experienced the type of confusion AFNI's letter expectedly generates; Hale was surprised and confused by AFNI's letter, and as a result of AFNI's stonewalling, he was unable to vindicate his rights without enlisting help outside of AFNI. However, whether Hale was confused is not relevant to the Court's determination that AFNI's letter was "plainly deceptive" as a matter of law. The Court must consider the letter from the vantage point of the unsophisticated consumer—not necessarily Hale. *See Wahl*, 556 F.3d at 645-46. Although the Court need not decide the issue, Hale's effective, proactive approach to resolving his dispute through the Better Business Bureau and Illinois Attorney General indicates that he probably does not exemplify the unsophisticated consumer. Moreover, the Seventh Circuit has held that "[a]lthough the question

whether a dunning letter violates the Fair Debt Collection Practices Act does not require evidence that the recipient *was* confused-or even, as we noted earlier, whether he read the letter-the issue of confusion (or, more precisely, of 'confusingness') is for the district judge to decide." *Bartlett v. Heibl*, 128 F.3d 497, 501 (7th Cir. 1997). As in *Bartlett*, what matters is that the Court finds AFNI's letter confusing and "plainly deceptive," even though we "do not like to think of ourselves as your average unsophisticated consumer." *Id.*

Finally, a challenged false statement must not only be confusing or misleading; it must also be "material" since the FDCPA "is designed to provide information that helps consumers choose intelligently, and by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)." *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009). Statements are material if they influence a consumer's decision—to pay a debt in response to a dunning letter, for example, *see Muha*, 558 F.3d at 628—or if they would impair the consumer's ability to challenge the debt at issue. *See Berg v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 07 C 4887, 2009 WL 901011, at *7 (N.D. Ill. Mar. 31, 2009). AFNI's false statements are material in both related senses; AFNI's statements that it is "unable to investigate" a consumer's dispute due to "insufficient information" both impair the consumer's ability to challenge the debt at issue and influence his or her decision to pay the debt.

In the present context, the materiality analysis nearly collapses into the Court's evaluation of whether AFNI's false statements are confusing or "plainly deceptive" in the first place. This is true because the type of confusion generated by AFNI's letter does not derive from merely unclear language. (The language of the statements, "we are unable to investigate" and "[y]ou have provided insufficient information to substantiate your claim" is fairly clear.)

The confusion comes, instead, from the puzzling message communicated when AFNI makes these statements in response to consumers who have already provided all of the information they possess and have already disputed their alleged debts in the only way available to them. The confusion relates to these consumers' perception of their rights in the face of AFNI's letter, and it is, by nature, material. More specifically, AFNI's statements are material to a consumer's determination of how to proceed after receiving AFNI's letter; the statements are material to both a consumer's decision to pay his debt, *see Muha*, 558 F.3d at 628, and the consumer's ability to challenge the debt at issue, *see Berg*, 2009 WL 901011, at *7. Because AFNI's false statements are both misleading and material, the Court finds that they violate § 1692e of the FDCPA.

### b. Bona fide error defense

AFNI argues that, even if the statements in its form letter were false in violation of § 1692e, the bona fide error defense shields AFNI from liability. The Court disagrees. Under the FDCPA, a debt collector may not be held liable for violating the Act "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Accordingly, a defendant may assert the bona fide error defense if it can show that the violation at issue "(1) was unintentional; (2) resulted from a bona fide error; and (3) occurred despite the defendant's maintenance of procedures reasonably adapted to avoid such error." *Ruth*, 577 F.3d at 803; *Kort v. Diversified Coll. Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005).

Whether the bona fide error defense applies to legal errors, in addition to procedural and clerical errors, is an "open question" that has divided the courts of appeals and prompted the

Supreme Court to grant certiorari on the issue. *Ruth*, 577 F.3d at 803. The Seventh Circuit has refrained from taking sides in the circuit split but recently held that:

> *if* the bona fide error defense is available at all for errors of law, it is available only to debt collectors who can establish that they reasonably relied on either: (1) the legal opinion of an attorney who has conducted the appropriate legal research, or (2) the opinion of another person or organization with expertise in the relevant area of law-for example, the appropriate government agency.

*Id.* at 804 (emphasis in original); *see also Herkert v. MRC Receivables Corp.*, No. 08 C 760, 2009 WL 2998557, at *5 (N.D. Ill. Sept. 17, 2009).

Because AFNI does not offer evidence to demonstrate that it satisfied this standard, AFNI's bona fide error defense must fail. Instead, AFNI lists a variety of other procedures it maintains—mostly to comply with the Fair and Accurate Credit Transactions Act ("FACTA") amendments to the Fair Credit Reporting Act ("FCRA") rather than the FDCPA. AFNI claims that when the FACTA was enacted, its compliance department "compiled as much information as was readily available to review to understand what [its] requirements were," then applied that information to implement new procedures. (Hess Dep. 37:4-14, June 9, 2009.) AFNI also receives updates from trade associations including the American Creditors Association ("ACA"), a network comprised of attorneys who belong to the ACA, and the Consumer Data Industry Association. (Anderson Dep. 7:6-10, 18-22.)

The form letter at issue was drafted by AFNI's compliance manager, Lisa Anderson. (*Id.* at 4:17-18, 9:3-14.) Anderson asserts that one of her primary roles involves keeping track of the laws governing AFNI to ensure that any changes in the laws are implemented as soon as possible. (*Id.* at 6:22-7:5.) Under Anderson's direction, AFNI responded to the enactment of the FACTA by consulting publications promulgated by the ACA, attending tele-seminars, reviewing the FACTA itself, and discussing the FACTA with "industry leaders" and the ACA attorney

network.  (*Id.* at 7:11-22, 10:22-11:7.)  Specifically, AFNI relied on two "fastfaxes" provided by the ACA.  These fastfaxes disseminated information that primarily concerned the implications of the FACTA amendments to the FCRA.  (Pl.'s Resp. to Def.'s Additional Facts Ex. X).

The Seventh Circuit has recently deemed procedures comparable to AFNI's insufficient to trigger the bona fide error defense.  In *Ruth*, the defendants identified "no evidence in the record indicating that they ever sought legal or regulatory advice" regarding whether the letter at issue complied with the FDCPA.  *Ruth*, 577 F.3d at 805.  Instead, they claimed that they attended training sessions on FDCPA compliance and relied on a trade association pamphlet drafted by an attorney.  *Id.*  In concluding that the pamphlet "falls far short of a legal opinion on which it was reasonable for defendants to rely," the Seventh Circuit listed three reasons that equally demonstrate the insufficiency of AFNI's fastfaxes.  *Id.*  First, the Seventh Circuit found that the defendants' pamphlet did not offer advice on the FDCPA; rather it was focused on compliance with another federal statute.  *Id.*  The same is true in this case; the fastfaxes focus on the FACTA amendments to the FCRA rather than the FDCPA. (*See* Pl.'s Resp. to Def.'s Additional Facts Ex. X.)  Second, the pamphlet in *Ruth* stated that it did not provide legal advice.  *Ruth*, 577 F.3d at 805.  AFNI's fastfaxes provide the exact same disclaimer.  (*See* Pl.'s Resp. to Def.'s Additional Facts Ex. X.)  The court stated that, "[t]hird, and perhaps most critically, the pamphlet does not provide any advice about how a disclosure is worded to comply with the FDCPA."  *Ruth*, 577 F.3d at 805.  Again, the same is true of AFNI's fastfaxes.  As the fastfaxes focus on the FACTA, they do not offer advice about how AFNI's form letter should be worded to comply with the FDCPA.  (*See* Pl.'s Resp. to Def.'s Additional Facts Ex. X.)

Additionally, in a recent case involving AFNI, the Seventh Circuit held that procedures comparable to those cited by AFNI in this case did not entitle AFNI to succeed on its bona fide

error defense. *See Seeger v. AFNI, Inc.*, 548 F.3d 1107 (7th Cir. 2009). Much like the instant case, in *Seeger*, AFNI stated that its procedures involved reviewing legal summaries prepared by the ACA and another trade association, submitting its form letter to the ACA, and reviewing excerpts of the relevant law. *Id.* at 1114. The Seventh Circuit found these procedures inadequate and stated specifically that AFNI's reliance on trade association communications was insufficient to entitle it to the bona fide error defense. *Id.*

AFNI fails to identify evidence that differentiates its compliance procedures from those rejected by the Seventh Circuit in *Ruth* and *Seeger*. In addition, most of the procedures AFNI identifies relate to compliance with the FCRA—not the FDCPA. Most significantly, AFNI offers no indication that it obtained or relied upon "(1) the legal opinion of an attorney who has conducted the appropriate legal research, or (2) the opinion of another person or organization with expertise in the relevant area of law-for example, the appropriate government agency" as required under *Ruth*. 577 F.3d at 803.

Finally, citing the Seventh Circuit's decision in *Kort v. Diversified Coll. Servs., Inc.*, AFNI argues that the bona fide error defense applies because AFNI's letter reflects its good-faith attempt to comply with the FCRA. 394 F.3d 530. However, AFNI's reliance on *Kort* is misplaced, and accordingly, this argument fails. *Kort* involved the collection of a student loan governed by the Higher Education Act. *Id.* at 532. The debt collection letter at issue in *Kort* included language mandated by the Department of Education ("DOE"), the government agency responsible for regulating enforcement of the Higher Education Act. *Id.* Although the court did not decide the issue, it noted that the language mandated by the DOE—and adopted wholesale by the defendant—may have erroneously applied the HEA in a way that violated the FDCPA. *Id.* at 536. The Seventh Circuit held that the defendant was entitled to the bona fide error defense

because, by following DOE orders, it did not intentionally violate the FDCPA, any presumed violation resulted from a bona fide error, and the defendant maintained reasonable procedures to avoid violating the FDCPA. *Id.* at 539.

AFNI's reliance on *Kort*, under these facts, fails for several reasons. AFNI claims that its letter complied with § 1681s-2 of the FCRA, which requires that letters notifying consumers that a dispute is considered frivolous or irrelevant must include "an identification of any information required to investigate the disputed information, *which may consist of a standardized form describing the general nature of such information*." 15 U.S.C. § 1681s-2(F)(iii)(II) (emphasis added). AFNI also claims that the additional information it requested from Plaintiffs tracks the information the FCRA requires from consumers who dispute their debt. The FCRA specifically provides:

> A consumer who seeks to dispute the accuracy of information shall provide a dispute notice directly to such person at the address specified by the person for such notices that—
> **(i)** identifies the specific information that is being disputed;
> **(ii)** explains the basis for the dispute; and
> **(iii)** includes all supporting documentation required by the furnisher to substantiate the basis of the dispute.

§ 1681s-2(D).

AFNI's purported reliance on these provisions of the FCRA does not equate with the defendant's adoption of DOE-mandated language in *Kort*. Unlike the defendant in *Kort*, AFNI was not required to adopt the language of the FCRA word-for-word, nor did it do so. Indeed, the FCRA provides only general guidelines. Most significantly, AFNI can cite no provision of the FCRA that entitles a debt collector to respond to a consumer's dispute by stating that it was "unable to investigate" the dispute when, in fact, it *was* able to investigate. Neither FCRA provision cited by AFNI suggests that it was appropriate for AFNI to request additional

information—using a form letter, or any other medium— from debtors who *already provided* sufficient information. Because *Kort* is inapposite, and AFNI fails to present evidence that it maintained adequate compliance procedures, AFNI cannot seek insulation from liability by asserting the bona fide error defense.

IV. CONCLUSION

The Court finds that AFNI's statements in its form letter are "false, misleading, or deceptive" in violation of 15 U.S.C. § 1692e, and AFNI is not entitled to assert the bona fide error defense under 15 U.S.C. § 1692k(c). Accordingly, Plaintiffs' motion for summary judgment on the issue of liability under § 1692e of the FDCPA is **GRANTED** and Defendant's motion for summary judgment is **DENIED**.

Enter:
/s/ David H. Coar

_____
David H. Coar
United States District Judge

**Dated:** January 26, 2010